**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Lloyd Chris WALKER,**
**Defendant-Appellant.**

**No. 82–1430.**

United States Court of Appeals,
Fifth Circuit.

July 15, 1983.

Mike DeGeurin, Percy Foreman, Houston, Tex., for defendant-appellant.

Edward C. Prado, U.S. Atty., Archie Carl Pierce, Sidney Powell, Asst. U.S. Attys., San Antonio, Tex., Walter Barnett, Frank Allen, Civ. Rights Div., Appellate Section, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before WISDOM, TATE and GARWOOD, Circuit Judges.

TATE, Circuit Judge:

The defendant-appellant Walker appeals his conviction and sentence for life imprisonment based upon his alleged involvement in a conspiracy to intimidate a witness who was going to testify before a grand jury. 18 U.S.C. § 241.[1] Two people were killed by a shot fired into a crowded bar that (according to the government witness) was intended to kill Michael Overstreet, the potential witness. Walker contends that he was not hired as a "hit man" to kill Overstreet and did not participate in a plan by Rummell, the named alleged coconspirator, to prevent this witness' appearance before the grand jury to testify as to the other alleged coconspirators' involvement in drug crimes. In Walker's most forceful contention, he argues that testimony by Rummell, who repeated Walker's admissions to prior involvement in acts of violence and testified to a specific instance in which Walker accompanied two of the drug dealers as armed protection, constituted evidence of extrinsic bad acts placed before the jury in violation of Fed.R.Evid. 404(b). Finding that the district court did not abuse its discretion in admitting Rummell's testimony under the circumstances shown, and that Walker's other contentions are without merit, we affirm the conviction below.

## I. The Extrinsic Acts Issue: Context Facts

In trial, Walker admitted to being present at the shooting at Pepe's Bar in Hidalgo County, Texas, and to fleeing with Rummell. He testified, however, that Rummell did the shooting and that he, Walker, had come to Hidalgo County at Rummell's request and expense solely to purchase a large quantity of marijuana. Walker thus denied any knowledge of or involvement in any conspiracy to intimidate or kill Overstreet.

Rummell, who agreed to testify against Walker in the federal proceedings in return for an agreement to dismiss state murder charges and who had pleaded guilty to the conspiracy to violate Overstreet's rights, testified on direct examination by the prosecution that he and other participants in drug smuggling feared the impact of Overstreet's agreement with the government to testify about their activities. Rummell testified that, desperate because of the upcoming grand jury date for Overstreet's testimony (and unsuccessful in two prior attempts to assassinate him) he, Rummell, from Hidalgo had telephoned Walker (who was a non-participant in the drug smuggling in Austin), with the intention of hiring him to kill Overstreet. He testified that he was "under the impression that Mr. Walker would assist . . . in this matter." Rummell further stated that in this telephone conversation he told Walker that he "needed [Walker's] assistance" and that

---

1. 18 U.S.C. § 241 (1968) proscribes the actions of "two or more persons" to "conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same . . . ."

Walker agreed to help, although without specifying the purpose. Walker then flew a private plane to join Rummell a few days before the shooting. According to Rummell, during those days they expressly discussed details of killing Overstreet and traced their victim to Pepe's bar. Rummell and Walker stayed several hours at the bar observing Overstreet; Rummell testified that as they left around midnight, Walker shot at Overstreet from the parking lot.

On cross-examination the defense questioned Rummell with respect to his agreement with Walker: whether Rummell actually had planned to kill Overstreet at the time he called Walker and had told Walker "exactly what the situation was." Rummell responded that he did not talk to Walker about shooting anyone until Walker arrived in Hidalgo County and that no one was present during any conversation he had with Walker discussing the shooting. On redirect, the prosecution questioned Rummell about why he would call Walker, a person uninvolved with the drug investigation, for the purpose of having him kill someone without specifically asking him if he would do so. At Walker's objection, the court did not permit Rummell to testify about Walker's reputation.[2] The trial court did allow Rummell to testify, however, as to why he had telephoned Walker, in response to the prosecutor's bench explanation that Rummell's prior relationship with Walker was relevant to explain what had caused him to call Walker to fly immediately to the scene to kill somebody. Walker continued to object to introduction of any evidence concerning his prior activities or his past relationship with Rummell.

Rummell testified that on an earlier occasion, prior to the drug transaction leading to the conspiracy to kill Overstreet, Walker had accompanied Rummell and his friend Statler (later to be involved in the drug smuggling) as armed "insurance [and] protection" to retrieve Statler's pickup truck that had been taken by a supposedly dan-

gerous person.[3] Rummell testified that during that incident he had mentioned to Walker that he "was having a problem with a gentleman that was going to testify against a group of people", and that Walker replied that "if I [Rummell] needed any help, to let him know."

In addition, Rummell related stories that Walker allegedly told him on several undated prior occasions before Rummell telephoned him to ask him to come to Hidalgo. According to Rummell, Walker boasted about killing people in the Viet Nam war and being "not opposed to doing so" in the future; Rummell stated that Walker had bragged about providing services "influencing people to pay money" and services for drug dealers "that would require something of a violent nature"—specifically (in the only instance about which Rummell could remember hearing), shooting a person in both knees.

In his testimony, Walker denied telling Rummell these stories about any prior violent activities and stated that these events had not occurred; however, he did not deny or discuss the pickup truck incident. He testified that in the telephone call precipitating his visit to Hidalgo, Rummell did not mention an agreement to kill Overstreet or perform any act of violence; rather, Rummell said he was receiving a load of marijuana and offered to sell some of it to Walker. Walker stated that he went to Hidalgo, paid Rummell $3,000 for marijuana, and accompanied Rummell in order to facilitate the drug sale; he testified further that he had no knowledge of Rummell's plan to kill Overstreet until after Rummell shot into the bar. On rebuttal, Rummell reiterated that Walker had fired the gun, and testified that he did not offer to involve Walker in a nonexistent marijuana deal, and that Walker did not pay him $3000.

At the end of trial, Walker objected to the prosecution-provided limiting instruc-

---

2. At the close of trial and at the prosecution's request, the court gave an instruction that the jury should not consider "for any purpose" Rummell's "testimony concerning his opinion of Mr. Walker's reputation."

3. Later in the trial, coconspirator Statler also testified that Walker, who had a gun in his car, accompanied Statler and Rummell to get the truck.

tion regarding Rummell's attempt to testify about Walker's reputation (*see* note 2 *supra*) and instead suggested a charge requiring that the jury disregard *all* of Rummell's testimony concerning Walker's prior acts or statements. The defense did not propose an instruction to limit the jury's permitted uses of the evidence of Walker's prior acts. The only charges before the jury with respect to these extrinsic acts were the prosecution provided instruction that it not consider "for any purpose" Rummell's "testimony concerning the defendant's reputation" and that "the defendant is not on trial for any act or conduct or offense not alleged in the indictment."

## II. *The Extrinsic Acts Issue: Resolution*

■ Walker contends that Rummell's testimony concerning his alleged statements of past violent acts and the pickup truck incident should have been excluded as improperly admitting evidence before the jury in violation of Fed.R.Evid. 404(b). That rule prohibits introduction of evidence of "other wrongs" to prove bad character or propensity to commit the charged offense, but permits its use for relevant purposes, such as to show motive, opportunity, intent, plan, and knowledge.[4] The proponent of the evidence must satisfy a two-step analysis set forth in *United States v. Beechum,* 582 F.2d 898, 911–13 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). The evidence of a prior wrong may be introduced (1) if it is relevant to an issue other than the defendant's character, and (2) if its probative value is not substantially outweighed by its undue prejudice.[5]

Walker argues that he did not brag to Rummell about killing or maiming, that the prosecution did not offer sufficient evidence that any of the events in Rummell's testimony actually occurred, and that these acts—and the uncontested incident involving the retrieval of the pickup truck—are relevant to no other purpose except to show Walker's bad character. Moreover, he urges, the prejudicial nature of the evidence of prior violent activities outweighs its probative value. The prosecution contends, inter alia, that Rummell's testimony was relevant to explain why Rummell telephoned Walker, especially in view of the cross-examination of Rummell that cast doubt upon the telephone call as being in aid of a conspiracy to kill Overstreet.

We now evaluate Rummell's testimony by the *Beechum* analysis.

### A.

■ If there is no reasonable basis for finding that the extrinsic offense occurred, it may not ordinarily be admitted. *Beechum,* 582 F.2d at 912–913. (However, in *Beechum* the court was referring to a test for the use of an extrinsic act as evidence of intent; it had previously noted, however, that there may be distinguishing factors in the use of extrinsic evidence to prove issues other than that of intent. *Id.,* 582 F.2d at 911 n. 15.)

The jury could have reasonably believed, from Rummell and Statler's testimony, that Walker escorted them during the pickup truck incident. Similarly, a jury could make a positive credibility determination and reasonably believe that Walker told Rummell about his war experiences and violent activities (including a kneecapping) in aid of drug dealers—conceding if only for present purposes, that these adverse admissions by Walker could be considered other "wrongs" by him within the purview of Rule 404.

The prosecution contends, however, that Walker's statements were not offered as

---

**4.** Fed.R.Evid. 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**5.** *Beechum* provides that the second step of Rule 404(b) analysis is whether the evidence satisfies Fed.R.Evid. 403. This rule provides, in pertinent part, that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. . . ."

proof that these incidents occurred, but argues that by telling them to Rummell, Walker had indicated his availability to assist Rummell by coercive or violent acts. The testimony thus derives its relevance to the present issue to which the extrinsic act is addressed—in this case, Walker's coming to Hidalgo and agreeing to participate in a conspiracy to kill Overstreet—from the mere fact that Walker made these statements, not from the truth or falsity of the content of the communication. *See United States v. Bobo,* 586 F.2d 355, 372 n. 23 (5th Cir.1978), *cert. denied sub. nom. Rowan v. United States,* 440 U.S. 976, 99 S.Ct. 1546, 59 L.Ed.2d 795 (1979). In *Bobo,* where a defendant was charged with conspiracy in a drug operation, we found that a coconspirator's testimony, in which he related a conversation he had with the leader of the ring where the leader said that the defendant had been arrested on a drug charge, was not offered to show the defendant's bad character. Rather, the fact that the defendant had been arrested and that the leader believed that as a result the defendant was likely to be the informer in the drug operation—and that the leader trusted his listener enough to discuss an informer problem with him—was relevant to show the existence of a drug conspiracy and in general to bolster the credibility and weight of the testifying coconspirator's testimony. 586 F.2d at 372.

We find that Walker's boasts to Rummell, and Walker's earlier role as companion to Rummell and Statler, are relevant to the limited issue of Walker's knowledge of and agreement to participate in a conspiracy to kill the grand jury witness. Walker himself brought the issues of knowledge and agreement into contention by inquiring on Rummell's cross-examination as to the actual words used to induce him to fly to Hidalgo, emphasizing that Rummell did not expressly ask him to kill anyone, and implying that Walker did not know of or agree to participate in a conspiracy.[6] Because Walker himself emphasized this lack of express agreement, Walker's prior communication and

contact specifically with Rummell—especially where Walker had agreed to help the coconspirators achieve another goal (rescue of the pickup truck) and had indicated willingness to help them against an adverse witness—became relevant to corroborate Rummell's ascribed purpose (questioned by Walker) for his telephone call to Walker. Rummell's testimony also served to some extent to prove that, subsequently, Walker readily and knowingly agreed to join these same people to achieve another, albeit much more heinous, goal. *See United States v. Roberts,* 619 F.2d 379, 383 (5th Cir.1980). Had Walker's cross-examination of Rummell not opened the door to this inquiry, a different issue might be presented.

### B.

We now reach the second prong of the *Beechum* inquiry: the application of Rule 403 (*see* note 5 *supra*) to determine whether the probative value of the extrinsic offense evidence is substantially outweighed by its undue prejudice. The reviewing court assesses the *incremental* probity of the evidence in relation to the other evidence, stipulations, or inferences that have been compiled in the case regarding the issue to which the extrinsic offense is relevant. *Beechum, supra,* 582 F.2d at 914, 916–17. Here, Walker's prior statements to and involvement with the coconspirators were probative of his implicit willingness to act in concert with them, which he contested in Rummell's cross-examination by inquiring as to whether Rummell had explicitly asked Walker over the telephone to kill Overstreet. In light of the doubt cast upon the existence of an agreement in which Walker knowingly joined the conspiracy, prior contacts and concerted action with the coconspirators would tend to prove that Walker understood, at the time Rummell telephoned him, that he was being asked to assist Rummell by coercive and possibly violent means, and also to some extent were corroborative of Rummell's testimony that on arrival in Hidalgo Walker readily agreed

---

**6.** In his subsequent testimony, Walker presented more fully his defense that he came to Hidalgo solely in order to buy marijuana from Rummell and that he did not know of any plan to kill Overstreet.

to join the conspiracy to kill the witness Overstreet by himself serving as hit man. The extrinsic offense evidence, therefore, would be of weight in the government's proof. Although Walker could be deemed to have agreed to join the conspiracy *after* he came to Hidalgo, the government greatly strengthened its case by establishing the basis for the prior telephonic communication—especially in view of Walker's subsequent defense that he came to Hidalgo for a different purpose.

We have little difficulty in determining that testimony regarding the pickup truck incident was admissible. Its probative value was not substantially outweighed by the prejudice it may have caused Walker. This extrinsic act is not a crime or of a heinous nature, *see Beechum, supra,* 582 F.2d at 917; *United States v. McMahon,* 592 F.2d 871 at 876; *Bobo, supra,* 586 F.2d at 372; the act shows little more than Walker's association with and willingness to aid two men who were later involved in the present conspiracy.

However, admission of Rummell's testimony of Walker's bragging is much more troubling. It is incrementally less probative than the pickup truck incident and vastly more prejudicial, because Walker implicates himself in killing and maiming, even though by bravado that may lack credence with respect to the actual occurrence of the events. Nevertheless, the prejudicial effect of this testimony is lessened, since these statements were offered to show only that Walker made the remarks and therefore would understand that Rummell, through innuendo, was asking him to come to Hidalgo and to assist by way of strong-arm tactics. The defense, moreover, did not ask for a limiting instruction to clarify the jury's use of Rummell's testimony.

We find, under these circumstances, that the introduction of Rummell's testimony was not barred by Rule 404(b).

### III. *Other Issues*

Walker raises a number of other contentions on this appeal, none of them meritorious:

### A. *Sixth Amendment Speedy Trial Guarantee*

█ Walker was initially arrested by state officials and incarcerated approximately nine months in state facilities on the charge of capital murder of the two persons who died in the shooting. After the state decided not to bring Walker to trial, the federal authorities charged him with the federal civil rights conspiracy crime for which he has been convicted. Walker contends that the period of delay between his arrest by state officials for murder and his trial in federal court for conspiracy to intimidate grand jury witness Overstreet constitutes a violation of his rights to a speedy trial under the sixth amendment.[7]

Walker does not contend that he did not receive a speedy trial after the federal indictment. Instead, he argues that the state arrest triggers the applicability of speedy trial rights in this case, because the federal authorities worked closely with the state prosecutors from the beginning of the state charge, because allegedly the initial murder charges were a result of federal and state officials' "forum shopping" to take advantage of state law that would keep Walker incarcerated without bail pending trial, and because the federal prosecutor allegedly instigated and used the delay in the state proceedings to its tactical advantage by accumulating evidence and developing Rummell's testimony.

The United States asserts that although it worked closely with the Texas authorities it had no intention initially to charge Walker with a federal offense. Only after the state dismissed the state charges, for reasons of hiatuses in the state prosecution we need not detail here, the government insists, did it intend to or obtain a federal

---

7. The sixth amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy trial."

indictment on the conspiracy charge. The evidence supports this contention.

■ The general rule is that ordinarily the federal constitutional right to a speedy trial arises after a *federal* accusation against the defendant is made, so that a prior state arrest based on the same facts as the subsequent federal charge does not implicate the federal constitutional guarantee. *See United States v. Hendricks,* 661 F.2d 38, 40 n. 1 (5th Cir.1981);[8] *Gravitt v. United States,* 523 F.2d 1211, 1215 n. 6 (5th Cir. 1975). *Accord, United States v. Brown,* 605 F.2d 389, 395 (8th Cir.), *cert. denied,* 444 U.S. 972, 100 S.Ct. 466, 62 L.Ed.2d 387 (1979); *United States v. Romero,* 585 F.2d 391, 398 (9th Cir.), *cert. denied,* 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979).

■ The defendant may attack a *pre-*indictment delay, however, as a violation of his fifth amendment right to due process. *United States v. Lovasco,* 431 U.S. 783, 788–90, 97 S.Ct. 2044, 2047–48, 52 L.Ed.2d 752 (1977). The "due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *Id.,* 431 U.S. at 790, 97 S.Ct. at 2049. Here, the government has shown adequate non-oppressive reason for the nine-month delay between state arrest and federal trial, and in addition has not shown any "actual prejudice to the conduct of the defense" or "that the Government intentionally delayed to gain some tactical advantage over [the defendant] or to harass [him]." *United States v. Marion,* 404 U.S. 307, 325, 92 S.Ct. 455, 466, 30 L.Ed.2d 468 (1971). We thus find no merit to the claim of a due process fair-trial violation resulting from the delay between state arrest and federal trial.

B. *Admission of False Exculpatory Statement.*

■ Walker next contends that reversible error occurred in the government's introduction, after denial of a pre-trial mo-

tion to suppress it, of a statement he made at the time of booking that (falsely) indicated he did not know Rummell, the coconspirator. Walker claims that the post-arrest statement should have been suppressed as made after he had invoked his right to consult counsel before further interrogation. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

The facts surrounding this contention are: When Walker was found and arrested by state police in New Mexico for the killings in Texas, he was given the *Miranda* warnings of his rights to remain silent and to have an attorney present during questioning. He concedes he did not request an attorney at this time. After Walker was brought to the police station, before the police recorded personal data in the booking procedure, Walker asked, "What in the hell is going on here?" The officer responded that he was charged with murder in Texas and asked if he knew a named victim of the killing or Boyce Rummell, to which Walker answered "No." The police officer then told Walker that was all the information he knew about the case, and proceeded with the questioning of personal data to complete the booking information forms.

At the suppression hearing, the police officers testified positively that Walker had not requested an attorney, after receiving his *Miranda* warnings, following his arrest and up through the booking. The arresting officer testified that Walker had replied "Yes, I do", to a question whether he understood his *Miranda* rights after they were read to him. Walker admitted that he did not request counsel when the *Miranda* warnings were read to him, stating that he simply remained silent. When asked if he had said anything about a lawyer between the scene of the arrest and when he was placed in jail, Walker replied: "I probably told them that I was going to need a good

---

**8.** The *Hendricks* court explained:

The Sixth Amendment right to a speedy trial arises when a person becomes 'accused' by either indictment, information, or arrest. The [state] arrest..., however, did not 'accuse' appellant for purposes of the Sixth Amendment right to a speedy trial in a subse-

quent *federal* prosecution. To hold otherwise would force federal indictments of state arrestees and stand inconsistent with the doctrine of dual sovereignty that recognizes the validity of successive state and federal prosecutions.

661 F.2d at 40 n. 1 (citations omitted).

lawyer." Walker also testified: "I *think* I said at one time during the course of the questioning that I realized I was going to need a very competent attorney" (emphasis added).

We find no reversible error in the district court's denial of the motion to suppress this response. In the first place, the district court was entitled to find under the evidence that Walker, an educated man, understood the *Miranda* warnings that he had a right to remain silent, that anything he said could be used against him, that he was entitled to a lawyer and to have a lawyer present at any questioning (and to appointment of a lawyer, if unable to afford one); that Walker never requested an attorney; and that the exchange, initiated by Walker, was not designed to elicit incriminating information. *Cf. Nash v. Estelle,* 597 F.2d 513 (5th Cir.), *cert. denied,* 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979). In the second place, even assuming admission of the statement was error, it is difficult to ascribe, in the context of the entire evidence, any great prejudice occasioned by its admission.

### C. Jury Charge

■ The district court charged the jury, over Walker's objection, that "[i]n determining the degree of credibility that could be afforded to the defendant's testimony, you are entitled to take into consideration the fact that he is the defendant and the very keen personal interest that he has in the results of your verdict." Walker argues that the district court abused its discretion in giving this instruction, particularly because in this case the chief witness against him, Rummell, had a similarly keen interest in the proceedings because of his plea bargain.

This court has routinely upheld charges stating that a jury may take into account in its deliberations the defendants' keen inter-est in the outcome of the case. *See, e.g., United States v. Ylda,* 643 F.2d 348, 352 (5th Cir.1981); *United States v. Jones,* 587 F.2d 802, 806 (5th Cir.1979). While the jury's verdict necessarily hung on its determination of Rummell's and Walker's credibility, which therefore lent special importance to the instruction, the jury also received an instruction warning it to receive Rummell's testimony with caution and to weigh it with great care. We find no error.

### D. Credit For State Pre-Trial Incarceration Toward Federal Sentence

■ Walker was not given credit toward his life sentence (presumably sought for parole purposes) for his eight-month state pre-trial incarceration as he awaited trial in state court for murder. He argues that such credit is required by 18 U.S.C. § 3568.[9] This court in *Ballard v. Blackwell,* 449 F.2d 868 (5th Cir.1971), interpreted this provision to mean that "time spent in State custody must be credited toward time served on a federal sentence if the continued State confinement was exclusively the product of such action by federal law-enforcement officials as to justify treating the State jail as the practical equivalent of a Federal one." 449 F.2d at 869. Walker argues that the active participation of the federal prosecutors in the state murder action justifies the conclusion that his state custody was the "functional equivalent" of his present federal custody for the civil rights conspiracy violation.

As the government asserts, Walker was confined in state prison because of a Texas statute that forbids bail in capital cases under certain circumstances. Cooperation between federal and state prosecutors did occur, but, as Walker concedes, the federal prosecutors did not issue a federal detainer against him during this period or, indeed, originally intend to charge him for a federal

---

**9.** Section 3568 provides, in pertinent part:

The sentence of imprisonment of any person convicted of an offense shall commence to run from the date on which such person is received at the penitentiary, reformatory, or jail for service of such sentence. The Attorney General shall give any such person credit toward service of his sentence for any days spent in custody in connection with the offense or acts for which sentence was imposed.

\*     \*     \*     \*     \*     \*

No sentence shall prescribe any other method of computing the term.

offense. His confinement was thus not "*exclusively* the product of ... Federal law-enforcement officials," *Ballard, supra,* 449 F.2d at 869 (emphasis added), and Walker is not entitled to credit under § 3568 for his pre-trial incarceration.

### E. *Government's Failure to Prove Elements of Offense*

█ Walker argues that he could not be deemed to have conspired to "intimidate" grand jury witness Overstreet in the "free exercise or enjoyment of any right or privilege," an essential element of the charged offense, 18 U.S.C. § 241 (*see* note 1 *supra*), because Overstreet, who was being compelled to testify, was not asserting the "*free exercise*" of a constitutional right.

We find little merit to this contention. "[T]he right to testify at trial is one secured by the constitution." *United States v. Thevis,* 665 F.2d 616, 626 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 57, 74 L.Ed.2d 61 (1983). As the government points out, few witnesses attend trials or appear before grand juries on a wholly voluntary basis; most are commanded by subpoena to appear. A witness served with a subpoena, or even one in Overstreet's position (who agreed to testify after being held in civil contempt) has as much constitutionally protected right to testify as he would have if he appeared without subpoena. *Accord, United States v. Pacelli,* 491 F.2d 1108, 1113 (2d Cir.), *cert. denied,* 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 49 (1974).

### IV. *Conclusion*

Because we find that the trial court did not err in permitting the government to introduce the extrinsic offense evidence before the jury, and that Walker's other contentions likewise do not possess reversible merit, we AFFIRM the conviction.

AFFIRMED.