UNITED STATES of America, Appellee,

v.

**William T. MARLER,
Defendant, Appellant.**

No. 84–1272.

United States Court of Appeals,
First Circuit.

Argued Jan. 8, 1985.

Decided March 8, 1985.

---

**9.** Appellants have not cited any part of the record in which there is any evidence of direct criticism of its products.

Kathleen A. Bryan, Boston, Mass., with whom Michael A. Collora and Hemenway & Barnes, Boston, Mass., were on brief for defendant, appellant.

Frank D. Allen, Jr., Civil Rights Division, Dept. of Justice, Washington, D.C., with whom Walter W. Barnett, Wm. Bradford Reynolds, Asst. Attys. Gen., Washington, D.C., and William F. Weld, U.S. Atty., Boston, Mass., were on brief for appellee.

Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and GIGNOUX,* Senior District Judge.

LEVIN H. CAMPBELL, Chief Judge.

William T. Marler, formerly a Lynn, Massachusetts, police officer, appeals from his conviction in the United States District Court for the District of Massachusetts for willfully depriving Lawrence J. Brown of his civil rights in violation of 18 U.S.C. § 242.[1]

Marler contends that the federal government violated his sixth amendment right to a speedy trial and his fifth amendment due process rights by waiting overlong to indict him on federal civil rights charges after his indictment on state law charges arising from the same incident. He also argues that the district court committed reversible error by giving an incorrect jury instruction on causation under 18 U.S.C. § 242 and by admitting an irrelevant and highly prejudicial statement made by Marler. We find these arguments unpersuasive and affirm the judgment of the district court.

The parties agree as to the preliminary events of the incident underlying Marler's conviction. On September 12, 1979, Marler, who was then off duty, was visiting with a fellow officer, Richard Blazak, and a friend of Blazak, Thomas Callinan, at the Lynn Yacht Club bar. A woman called the club's bartender, reporting that two men had removed a small package from Callinan's car. The bartender transmitted this information to Marler, Blazak, and Callinan, who left the club to investigate. Upon securing a description of the suspects and a statement that the suspects were walking toward the nearby Beef and Sea Restaurant, Blazak and Callinan took off in Callinan's car to find the suspects while Marler proceeded directly to the Beef and Sea on foot.

Marler testified that when he arrived at the Beef and Sea parking lot he spotted a man fitting the description of one of the suspects rummaging through a garbage barrel. Marler recognized the man to be Lawrence Brown, an alcoholic whom the Lynn police took into protective custody on a regular basis. At the time of the incident in question, Brown was drunk and unsteady. Marler also noticed a second man, later identified as Richard Anderson, sitting some feet away attempting to open a can of dog food with a rock.

At this point, Blazak and Callinan arrived. Marler, Blazak, and Callinan surmised that the package taken from Callinan's car was the can of dog food. Callinan decided not to press charges, but the officers decided to take Brown and Anderson into protective custody. Blazak asked an employee of the Beef and Sea to call for a police cruiser.

At this point, the testimony diverges. Marler asserts that Brown kept wandering off toward Lynn Harbor, which abutted the Beef and Sea's parking lot, in an effort to avoid custody. He testified that Blazak retrieved Brown a number of times and finally he himself attempted to bring

---

* Of the District of Maine, sitting by designation.

1. Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States ..., shall be fined not more than $1,000 or imprisoned not more than one year, or both; and if death results shall be subject to imprisonment for any term of years or for life.

Brown back into the group. According to Marler, Brown, in backing away from Marler, wandered too close to the bulkhead at the edge of the parking lot and either fell or jumped into Lynn Harbor. Marler states that he did not attempt to rescue Brown because of his fear of water. Instead, he contends that he returned to the group, led Anderson to the harbor's edge, and asked him to talk his friend into getting out of the water. According to Marler, Anderson then jumped into the harbor of his own accord to save his friend. Anderson swam to some rocks a few feet away and climbed to safety, but Brown drowned.

The United States version of these events is markedly different. It asserts that after having words with Brown, Marler intentionally pushed both Brown and Anderson into the water, causing Brown's death. The government presented two witnesses who testified that they saw Marler push both Brown and Anderson across the parking lot and into the water and three witnesses who did not see Brown being pushed into the water but who testified that they did see Marler push Anderson into the harbor. All the witnesses were situated in or near the Beef and Sea Restaurant, approximately 200 feet from the seawall where Brown went into the harbor.

After the incident, Marler gave his story to the police. When asked why he did not try to save Brown, Marler stated that he was afraid of water and that he "wouldn't go in any water for any fucken [sic] PC [(person taken into protective custody)]."

Less than two weeks after the incident, an Essex County grand jury indicted Marler for manslaughter and two counts of assault and battery. Tried before a jury in the state court in December 1979, he was acquitted of manslaughter but convicted on both counts of assault and battery. The Massachusetts Appeals Court reversed Marler's convictions, *Commonwealth v. Marler*, 11 Mass.App. 1014, 419 N.E.2d 854

(1981), but after a second state trial on the assault and battery charges in September 1981, Marler was again found guilty. He was sentenced to, and served, a sentence of three years' probation.

Federal authorities were not involved in the initial investigation into Brown's death nor in Marler's arrest. The incident was first brought to the attention of the federal government when the FBI received a complaint in January 1980, after the first state trial. Federal authorities secured the state court trial transcript in October 1980 but did not initiate their own investigation of the incident until December 1981. The federal government did not request that the state's evidence be transferred to it until August 1982, almost one year after the close of the second state trial. A federal grand jury first heard evidence in the case in July 1983 and ultimately indicted Marler for willfully violating Brown's right not to be deprived of liberty without due process of law. The present indictment was returned on November 3, 1983, over four years after the incident occurred.

On December 13, 1983, Marler moved in the district court to dismiss the federal indictment on speedy trial and due process grounds. After a hearing, the district court denied Marler's motion. *United States v. Marler*, 583 F.Supp. 1456 (D.Mass.1984). After a seven-day trial before a jury, Marler was convicted on March 1, 1984. On April 4, 1984, Marler was sentenced to 15 years. Marler filed a notice of appeal, and the court stayed execution of his sentence pending resolution of this appeal.

## I. SIXTH AMENDMENT SPEEDY TRIAL RIGHT

■ Although the speedy trial provision of the sixth amendment [2] and the due process clause of the fifth amendment both protect individuals against unreasonable prosecutorial delay, they cover distinct stages of the pre-trial process. The Su-

---

**2.** "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public

trial...."

preme Court has stated that "it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the Sixth Amendment." *United States v. Marion*, 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971). Thus, "[a]lthough delay prior to arrest or indictment may give rise to a due process claim under the Fifth Amendment, see *United States v. Lovasco*, 431 U.S. 783, 788–89 [97 S.Ct. 2044, 2047–2048, 52 L.Ed.2d 752] (1977), or to a claim under any applicable statutes of limitations, no Sixth Amendment right to a speedy trial arises until charges are pending." *United States v. MacDonald*, 456 U.S. 1, 7, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1982).[3]

Marler does not complain of any undue delay in the period between his federal arrest and indictment and his federal trial. Instead, he claims that his sixth amendment right attached at the time of his state indictment, and that the 53-month interval between that indictment (September 24, 1979) and Marler's federal trial on charges arising from the same incident (February 21, 1984) constituted a violation of his speedy trial right. The question before us, then, is whether under these circumstances a state indictment may trigger an individual's speedy trial right so as to force the federal government to bring him promptly to trial on any federal charges that may arise from the same course of conduct.

Marler argues that the state indictment, like a federal arrest, "is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and friends." *Marion*, 404 U.S. at 320, 92 S.Ct. at 463. Because "[t]hese considerations

were substantial underpinnings" for the Court's decision to extend the reach of the speedy trial guarantee to the arrest stage, *id.*, Marler contends that the same considerations require us to find that his sixth amendment right attached when he was "accused" by the state.

Marler, however, overlooks Supreme Court precedent indicating that very different considerations control when the issue is whether accusation by one sovereign triggers speedy trial rights as to possible indictments by another sovereign.

Although the Supreme Court has never directly ruled on this issue, it gave a clear indication of its position in *United States v. MacDonald*, 456 U.S. at 6–11, 102 S.Ct. at 1500–03. In *MacDonald*, the Court held that the 51-month period between the dismissal of military charges against MacDonald and his subsequent indictment on civilian charges stemming from the same incident could not be considered in determining whether the delay in bringing MacDonald to trial in civilian court violated his speedy trial rights. The Court rejected the lower court's analysis that charges were continuously pending during the entire period between MacDonald's military arrest and his later civilian indictment, ruling that after the military charges were dismissed, "MacDonald was not under arrest, not in custody and not subject to any criminal prosecution" and therefore not "accused" for sixth amendment purposes. *Id.* at 10, 102 S.Ct. at 1503. The Court, to be sure, declined to reconsider the Court of Appeals conclusion "that MacDonald's military arrest was the functional equivalent of a civilian arrest" for speedy trial purposes, *United States v. MacDonald*, 531 F.2d 196, 204 (4th Cir. 1976), because the government expressly declined to raise the issue. *MacDonald*, 456 U.S. at 9, 10 n. 10, 102 S.Ct. at 1502, 1503 n. 10. It noted, however, that

---

**3.** Once a defendant has been officially "accused," the court must balance four factors to determine whether the defendant has been deprived of his speedy trial right: the length of the delay; the reasons for the delay; whether and how the defendant asserted his right; and any

prejudice to the defendant caused by the delay. *Barker v. Wingo*, 407 U.S. 514, 530–33, 92 S.Ct. 2182, 2191–93, 33 L.Ed.2d 101 (1972). Given our disposition of Marler's sixth amendment claim, *see* pages 210–213, *infra*, we do not reach this balancing test.

The initial Court of Appeals panel held that the prosecution by the Army and that by the Justice Department were conducted "by the government in its single sovereign capacity...." *Id.*, at 204. *Of course, an arrest or indictment by one sovereign would not cause the speedy trial guarantee to become engaged as to possible subsequent indictments by another sovereign.*

*Id.* at 10 n. 11, 102 S.Ct. at 1503 n. 11 (emphasis added).

This conclusion, seemingly self-evident to the Court, flows from the doctrine of dual sovereignty, which the Court recognized in *United States v. Lanza*, 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314 (1922), and reaffirmed in *Abbate v. United States*, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959). The dual sovereignty doctrine provides that "the federal government is not bound by the actions of state authorities and that successive state and federal prosecutions are constitutionally permissible." *United States v. Mejias*, 552 F.2d 435, 441–42 (2d Cir.), *cert. denied*, 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 115 (1977). To be sure, this doctrine does not require that the actions of federal and state officials be considered separately in all criminal contexts. *See, e.g., Murphy v. Waterfront Commission*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964) (state may not, absent an immunity grant, compel a witness to give testimony that might incriminate him under federal law); *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) (evidence seized in violation of fourth amendment by state police not admissible in federal prosecutions). *See also United States v. Lai Ming Tanu*, 589 F.2d 82, 89 (2d Cir.1978). But a ruling that a defendant's right to a speedy federal trial attaches upon his state indictment would implicate the very concerns that led the Court to formulate the dual sovereignty doctrine in the double jeopardy area.

█ Were we to hold that Marler's state court indictment triggered his speedy trial right, we would in effect be requiring the federal government to keep continually abreast of all state criminal investigations that may present the possibility of federal prosecution and to pursue their own investigations, arrests, indictments, and trials so as to conform with state-dictated timing. This is obviously counter to the dual sovereignty doctrine as well as to effective, responsible law enforcement. *See Abbate*, 359 U.S. at 195, 79 S.Ct. at 670 ("if the States were free to prosecute criminal acts violating their laws, and the resultant state prosecutions bar federal law enforcement based on the same acts, federal law enforcement must necessarily be hindered"). *See also Lovasco*, 431 U.S. at 795, 97 S.Ct. at 2051 ("Rather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refused to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of 'orderly expedition' to that of 'mere speed.' ") (citation omitted). Thus, whatever the weaknesses in our dual system of justice, these could only be exacerbated by the proposed expansion of the sixth amendment speedy trial right. The only applicable constitutional provision here is the due process clause of the fifth amendment.

The weight of authority is consistent with our ruling. *See United States v. Walker*, 710 F.2d 1062, 1069 (5th Cir.1983) ("The general rule is that ordinarily the federal constitutional right to a speedy trial arises after a *federal* accusation against the defendant is made, so that a prior state arrest based on the same facts as the subsequent federal charge does not implicate the federal constitutional guarantee."), *cert. denied*, —— U.S. ——, 104 S.Ct. 995, 79 L.Ed.2d 229 (1984); *United States v. Hendricks*, 661 F.2d 38, 40 n. 1 (5th Cir. 1981); *United States v. Brown*, 605 F.2d 389, 395 (8th Cir.), *cert. denied*, 444 U.S. 972, 100 S.Ct. 466, 62 L.Ed.2d 387 (1979); *United States v. Romero*, 585 F.2d 391, 398 (9th Cir.1978), *cert. denied*, 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979);

*United States v. Mejias*, 552 F.2d 435, 441–43 (2d Cir.1977). Moreover, contrary to Marler's suggestion, the law of this circuit does not endorse his position; the limited exception to the general rule recognized in *United States v. Cabral*, 475 F.2d 715 (1st Cir.1973), is inapplicable to the facts of his case. It is true we held in *Cabral* that the state arrest there triggered a defendant's sixth amendment rights with respect to a subsequent federal prosecution, but we reached that result because we felt the *basis* for the arrest was a federal offense.

In *Cabral*, state officers arrested the defendant for possession of a sawed-off shotgun while investigating him for the sale of stolen property. Three days after the arrest, state authorities turned the weapon over to a federal officer. Cabral was indicted in state court for grand larceny, and 15 months later, was indicted on federal weapons charges. In response to Cabral's claim that his sixth amendment rights had been violated, the federal government argued that the 15-month delay should not be counted because the arrest for possession of the shotgun was merely a "temporary device" used by state authorities to hold Cabral until further evidence regarding his sale of stolen property could be gathered. *Id.* at 718.

The court rejected this argument, finding that Cabral's arrest was "unequivocally" for possession of an illegal firearm and that "[t]he [federal] government's prosecution of this charge was initiated only three days later when ... state authorities turned over this weapon to a federal officer." *Id.* The court considered the prompt surrender of the weapon to federal custody and the arrest on the *same charges* later prosecuted in federal, not state, court to have converted the initial arrest into a federal "accusation" on weapons charges for sixth amendment purposes. This ruling finds some support in other decisions that have indicated that where the basis for a state arrest is a federal law violation, the suspect's speedy trial right attaches for purposes of federal prosecution on the date

of the state arrest. *See United States v. Nixon*, 634 F.2d 306, 309 (5th Cir.) (sixth amendment clock runs at time of initial arrest "when the next indictment is for precisely the same offense and same transaction") (citing *Cabral*), *cert. denied*, 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981); *United States v. Avalos*, 541 F.2d 1100 (5th Cir.1976) (if state arrest for same charge later tried in federal court, sixth amendment right attaches); *Gravitt v. United States*, 523 F.2d 1211, 1215 n. 6 (5th Cir.1975) ("For purposes of determining when the right to speedy trial attaches, the *basis* for the arrest is critical.") (citing *Cabral*); *United States v. DeTienne*, 468 F.2d 151, 155 (7th Cir.1972) (sixth amendment right attaches at time of state arrest if federal indictment "really only gild[s] the charge underlying [defendant's] initial arrest and the different accusatorial dates between them are not reasonably explicable...."), *cert. denied*, 410 U.S. 911, 93 S.Ct. 974, 35 L.Ed.2d 274 (1973). *Cf. United States v. Lai Ming Tanu*, 589 F.2d 82 (2d Cir.1978) (leaving open question of whether sixth amendment right attaches on state arrest if same charges later prosecuted in federal court). Assuming, but without deciding, that this exception to the general rule survives *MacDonald*, we find the exception clearly inapplicable to the present case.

Here the initial arrest was based solely on state law charges different from the federal charge presently at issue. Federal authorities were not involved. The incident was first called to their attention after the first state trial; they did not examine the state's evidence until after the defendant's second trial. *See also Mejias*, 552 F.2d at 442. Even if we consider that "[i]nvocation of the speedy trial provision need not await ... formal charge," *Marion*, 404 U.S. at 321, 92 S.Ct. at 463, we must find some evidence of an official accusation on federal charges. It is simply not sufficient that the state and federal charges arose from the same incident. Thus, it is clear that a federal accusation was not present in this

case until Marler was indicted on the civil rights charge.[4]

## II. DUE PROCESS CLAIM

Having determined that Marler's sixth amendment rights did not attach until his federal indictment, we next consider whether the lengthy pre-indictment delay violated Marler's due process rights.

Although statutes of limitations are " 'the primary guarantee against bringing overly stale criminal charges,' " *United States v. Marion*, 404 U.S. 307, 322, 92 S.Ct. 455, 464, 30 L.Ed.2d 468 (1971) (quoting *United States v. Ewell*, 383 U.S. 116, 122, 86 S.Ct. 773, 777, 15 L.Ed.2d 627 (1966)), the Supreme Court has held that "the Due Process Clause has a limited role to play in protecting against oppressive delay." *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977).

■ To prevail on a due process challenge, a defendant bears the heavy burden of showing that the delay in indictment caused him *actual* prejudice *and* that the delay was "undertaken by the Government solely 'to gain tactical advantage over the accused.' " *Id.* at 795, 97 S.Ct. at 2051 (quoting *Marion*, 404 U.S. at 324, 92 S.Ct. at 465). *See also United States v. Capone*, 683 F.2d 582, 589 (1st Cir.1982); *United States v. Ciampaglia*, 628 F.2d 632, 639 (1st Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980); *United*

States v. Lieberman*, 608 F.2d 889, 902 (1st Cir.1979), *cert. denied*, 444 U.S. 1019, 100 S.Ct. 673, 62 L.Ed.2d 649 (1980); *United States v. Indelicato*, 611 F.2d 376, 383 (1st Cir.1979).

■ Marler asserts that the government's delay in indicting him actually prejudiced his ability to present his defense in three ways. First, he notes that in the 54 months between the incident and his federal trial, "critical aspects of the key government witnesses' testimony changed in material respects from the testimony given closer to the event." Second, Marler points out that the Beef and Sea Restaurant was destroyed, the area plowed under, and the bulkhead modified before his federal trial. This, he contends, precluded a jury view of the scene, something that occurred in both state trials, and deprived him of his ability to impeach the testimony of the eyewitnesses. Finally, he argues that a critical witness for the defense, Richard Anderson, became incompetent to testify in the period between the first state trial and the federal trial.

Of these asserted grounds of prejudice, only the first has any weight at all. We agree with the district court that the destruction of the scene of the incident did not prejudice Marler because

> not only is the granting of a jury view a matter of discretion, *see, e.g., United*

---

**4.** Even if we were somehow to find that Marler stood "accused" of his federal crime at the time of his state indictment, *United States v. MacDonald* indicates that the accusation was put to rest for sixth amendment purposes by Marler's state court conviction. In deciding that "[a]ny undue delay after charges are dismissed, like any delay before charges are filed, must be scrutinized under the Due Process Clause, not the Speedy Trial Clause," the *MacDonald* Court emphasized that the speedy trial guarantee is designed primarily to prevent the deleterious personal effects that prolonged, unresolved public accusations may cause. Thus, it is the pendency of the untried charges that is the focus of sixth amendment analysis. It follows that where a charge is resolved either by dismissal (as in *MacDonald*), acquittal, or conviction (as in the instant case),

> the speedy trial guarantee is no longer applicable. At that point, the formerly accused is,

> at most, in the same position as any other subject of a criminal investigation. Certainly the knowledge of an ongoing criminal investigation will cause stress, discomfort, and perhaps a certain disruption in normal life.... But with no charges outstanding, personal liberty is certainly not impaired to the same degree as it is after arrest while charges are pending.

*MacDonald*, 456 U.S. at 8–9, 102 S.Ct. at 1502. We find Marler's distinction between dismissal and conviction untenable. Any negative personal consequences of his state conviction flowed not from the pendency of any federal accusation, but rather from the state court jury's determination that Marler had violated the law and should be punished for it. The federal judicial system should not also be punished for Marler's conviction.

*States v. Bryant,* 563 F.2d 1227, 1230 (5th Cir.), *cert. denied,* 435 U.S. 972 [98 S.Ct. 1616, 56 L.Ed.2d 65] ..., but the government's collection of schematic [scaled] drawings and both on-site and aerial photographs, in conjunction with the testimony of eyewitnesses, should suffice to familiarize the jury adequately with the physical setting.

*Marler,* 583 F.Supp. at 1460. Anderson's unavailability also did not prejudice Marler's defense. His testimony at the first state trial "was so self-contradictory and incoherent," *id.,* as to make Marler's trial counsel sorry he called him.[5] Indeed, neither side called Anderson at the second state trial, reflecting the fact that his testimony was so jumbled as to render it of no probative value.

Marler's remaining asserted ground of prejudice is that prosecution witnesses suffered lapses of memory and, in some instances, changed their stories to the detriment of the defense. Generally, the assertion that memories have dimmed with the passage of time cannot establish actual substantial prejudice. *Marion,* 404 U.S. at 325–26, 92 S.Ct. at 465–66; *United States v. Snyder,* 668 F.2d 686, 689 (2d Cir.), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982); *United States v. Elsbery,* 602 F.2d 1054, 1059 (2d Cir.), *cert. denied,* 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979); *United States v. King,* 560 F.2d 122, 131 (2d Cir.), *cert. denied,* 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977); *United States v. Mays,* 549 F.2d 670, 680 (9th Cir.1977); *United States v. Finkelstein,* 526 F.2d 517, 526 (2d Cir. 1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976). This is especially true where the failure to recall is by *prosecution* witnesses, whose faltering testimony works to the advantage of the defense. *See Snyder,* 668 F.2d at 689.

Where, however, the defense can show that actual impairment of witnesses' recollections resulted from the pre-indictment delay, *see Mays,* 549 F.2d at 680, and that the memory flaws were so egregious that the defendant is essentially "convicted on failing memories," he may be able to establish substantial prejudice. *Dufield v. Perrin,* 470 F.Supp. 687, 692 (D.N.H.1979) (evaluating prejudice for sixth amendment purposes). *Cf. Snyder,* 688 F.2d at 689.

Marler has documented a number of instances in which the various prosecution witnesses forgot or altered elements of their prior testimony. But we do not find that the changes in testimony unambiguously aided the prosecution, nor has the defendant shown that changes benefitting the prosecution were influenced by the pre-indictment delay. *See Elsbery,* 602 F.2d at 1059 ("There is no reason to believe that the changes of heart, if they did occur, would not have occurred even if the indictment had been brought sooner."). As for the memory lapses, most were of a minor character. Those alterations or lapses that may have affected the defense, *e.g.,* where the witnesses were located as they watched the incident and whether their view was clear, were reflected in the record. This was not a case where prejudice flowed from the fact that "what has been lost can rarely be shown." *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193. Using prior witness statements and testimony taken at the earlier state proceedings, Marler had sufficient opportunity to exploit the witnesses' memory lapses in his cross-examination and at closing argument, and did so to his decided advantage. We cannot therefore determine that Marler was actually prejudiced by witnesses' fading recollections.

In any case, Marler has failed to establish the second element of his due process

---

**5.** At a pre-trial hearing, John Jennings, Marler's state court trial counsel, responded as follows to questioning by Michael Collora, Marler's federal court trial counsel:

Q Did you call Mr. Anderson as a witness?
A I did.
Q Did you feel, when you called him, his testimony would be favorable to you?

A When I called him?
Q How did you feel after that?
A Unhappy.

On cross-examination, Mr. Jennings testified as follows:

Q You were not pleased with Mr. Anderson's testimony at the trial, is that a fair statement?
A It is.

claim: that the government intentionally delayed his federal indictment to gain an unfair tactical advantage or for other bad faith motives. Marler charges that "[t]he government's sole reason for the long delay in this case was the 'dual prosecution policy,'" which provides in pertinent part:

> A federal prosecution will not be authorized unless the state proceeding left substantial federal interests demonstrably unvindicated. Even so, a dual prosecution is not warranted unless a conviction is anticipated and—if the state proceeding resulted in a conviction—normally will not be authorized unless an enhanced sentence in the federal prosecution is anticipated.

United States Department of Justice, *United States Attorneys' Manual* § 9, c. 2, pp. 18–20 (Jan. 3, 1980) (Title 9 Criminal Division) (footnotes omitted). We agree with the district court that the tactical decision embodied in this policy is not the type of abusive, bad faith decision that the *Lovasco* Court was concerned about. *See Marler*, 583 F.Supp. at 1460 ("Far from reflecting any bad faith, such initial deference to a state prosecution followed by federal action, commenced in response to a perceived lack of success in state court, represents a permissible, indeed laudatory, approach to law enforcement in a time of limited resources and manpower.").

Marler also contends, somewhat contradictorily, that the government deliberately delayed its indictment solely to enhance its case, awaiting the destruction of the scene and the loss of witnesses' recollections. Even if we were to credit federal authorities with this kind of prescience, Marler has completely failed to support this contention.

In sum, while we believe the government can justly be criticized for its failure to pursue this case right after the first state trial,[6] we are unable to say that the delay actually prejudiced Marler's defense or that the government's conduct demonstrated the kind of bad faith or recklessness necessary to establish a due process violation.

### III. JURY INSTRUCTION ON CAUSATION

The criminal civil rights statute under which Marler was convicted provides, in relevant part, that *"if death results* [from the civil rights violation, the defendant] shall be subject to imprisonment for any term of years or for life." 18 U.S.C. § 242 (emphasis added). Marler contends that the judge committed reversible error by refusing to charge the jury that to find Marler guilty under section 242, it must find that his actions were the direct, not just the proximate, result of Brown's death.[7]

 We think the district court was correct in charging that Marler could be convicted under section 242 if Brown's death was a proximate result of Marler's conduct "in the sense of being a natural and fore-

---

**6.** As the district court noted,
> the government, if in fact concerned solely with the length of defendant's state sentence, had little if any reason to await the outcome of his appeal and second trial; only in unusual circumstances could an enhanced sentence have been imposed on retrial. *See, e.g., North Carolina v. Pearce*, 395 U.S. 711 [89 S.Ct. 2072, 23 L.Ed.2d 656] ... (1969)....

*Marler*, 583 F.Supp. at 1460.
In the absence of evidence from which to infer a bad motive, we are left with the government's explanation, such as it is.

**7.** At trial, Marler contended that Brown's death was the direct result of Brown's own act, *i.e.*, jumping or falling into the harbor. Additionally, Marler sought to establish that Brown actually died of a heart attack flowing from a pre-existing heart condition, rather than by drowning. Marler therefore requested the following jury instruction on causation:
> The indictment charges the defendant with the crime of willfully depriving Mr. Brown of his Constitutional right not to be deprived of his liberty without due process of law with the result that he died. But, death cannot be found to result from the defendant's deprivation of Mr. Brown's Constitutional rights if his death was caused by Mr. Brown's own act, whether accidentally or intentionally, or if it was caused by an intervening act.... You must find the defendant not guilty if you find that Mr. Brown's death resulted from his own actions or an intervening cause.

seeable result of that conduct."[8] An essential element of the underlying crime, of course, is willfulness; a defendant must be proved to have "willfully" subjected the victim to a deprivation of civil rights. But if so, and death "results"—whether or not it was intended—the higher penalty applies provided death was a natural and foreseeable result of the improper conduct. As the Fifth Circuit explained in reaching the same conclusion,

A fundamental principle of criminal law is that a person is held responsible for all consequences proximately caused by his criminal conduct. Thus, where events are foreseeable and naturally result from one's criminal conduct, the chain of legal causation is considered unbroken and the perpetrator is held criminally responsible for the resulting harm. When the Congress provided that any deprivation of defined rights under color of law resulting in death may be punished by life imprisonment, we must consider it to have been fully cognizant of the principles of legal causation. We adhere to the accepted practice among federal courts in construing a federal criminal statute where specific terms are left undefined. We give those terms their common law meaning. *See United States v. Turley,* 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957). No matter how you slice it, "if death results" does not mean "if death was intended." To hold otherwise would make a mockery of the statute.

*United States v. Hayes,* 589 F.2d 811, 821 (5th Cir.), *cert. denied,* 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979). *Cf. United States v. Guillette,* 547 F.2d 743, 749 (2d Cir.1976) (interpreting "if death results" in the conspiracy provisions of the criminal civil rights statute, 18 U.S.C. § 241), *cert. denied,* 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977); *United States v. Harris,* 701 F.2d 1095, 1101 (4th Cir.) (same), *cert. denied,* —— U.S. ——, 103 S.Ct. 3554, 77 L.Ed.2d 1400 (1983).

## IV. ADMISSIBILITY OF MARLER'S STATEMENT

Marler contends that the district court erred in admitting his statement that he "was not going in any water for any fucken [sic] PC." Marler objected to introduction of the statement because, he claimed, it was irrelevant, *see* Fed.R.Evid. 401, and any probative value it had was outweighed by its highly prejudicial nature, *see* Fed.R. Evid. 403. The court admitted the statement, finding it relevant on the issue of Marler's intent to deprive Brown of his civil rights, but gave this limiting instruction regarding its use:

I want to tell you that this indictment does not charge Mr. Marler with a failure to rescue but rather in the words of the indictment itself, it says: "He did willfully assault Lawrence J. Brown by pushing him into the waters of Lynn Harbor and thereby deprived him of his constitutional right."

But you may regard this testimony that is now being offered to you for whatever other relevant purpose you think it may have, including evidence of

---

8. The contested portion of the court's charge reads as follows:

And the fifth and final essential element that the Government must prove beyond a reasonable doubt, that Lawrence Brown died as a result of the defendant's conduct. It is not necessary for the Government to establish that the defendant intended Mr. Brown to die as a result of his actions, or that Brown's death was a direct result of his conduct. Rather, the Government must prove beyond a reasonable doubt that Mr. Brown's death was a proximate result of the defendant's conduct, in the sense of being a natural and foreseeable result of that conduct.

Again, that the Government must prove that Mr. Brown's death was the proximate result of the defendant's conduct in the sense of being a natural and foreseeable result of that conduct.

Should you find that some other factor, such as Mr. Brown's own conduct or some other intervening circumstance caused or contributed to Mr. Brown's death, you may still find this final element of the offense satisfied if you find beyond a reasonable doubt that such other factor was foreseeable and a natural result of defendant's action.

what Mr. Marler's intentions or state of mind was during these events.[9]

"Wide discretion as to the relevancy of evidence is vested in the trial judge, both as to its probative value and its prejudicial impact. *United States v. DeVincent,* 546 F.2d 452, 457 (1st Cir.1976) [, *cert. denied,* 431 U.S. 903 [97 S.Ct. 1694, 52 L.Ed.2d 387] (1977) ]; *United States v. Cowden,* 545 F.2d 257, 268 (1st Cir.1976) [, *cert. denied,* 430 U.S. 909 [97 S.Ct. 1181, 51 L.Ed.2d 585] (1977) ]." *United States v. Strahl,* 590 F.2d 10, 12 (1st Cir.1978), *cert. denied,* 440 U.S. 918, 99 S.Ct. 1237, 59 L.Ed.2d 468 (1979). We cannot say that the court below abused its discretion in admitting Marler's statement. *United States v. Coast of Maine Lobster Co.,* 557 F.2d 905, 908 (1st Cir.), *cert. denied,* 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d 136 (1977).

To convict, the prosecution had to prove that Marler willfully violated Brown's civil rights. The requisite intent could be established by "all the attendant circumstances—the malice of [the defendant], the weapons used in the assault, its character and duration, the provocation, if any, and the like." *Screws v. United States,* 325 U.S. 91, 107, 65 S.Ct. 1031, 1038, 89 L.Ed. 1495 (1945). A juror might reasonably find Marler's statement probative on the issue of his malice toward Brown and therefore on his intent or state of mind in taking the actions he did. The court's limiting instructions, by focusing the jury's attention on the purpose behind the evidence, tend to guard against misuse of the evidence for an irrelevant, prejudicial purpose. That there was an obscenity in the statement did not make it any the less material nor so prejudicial as to have rendered it inadmissible. *Cf. United States v. Barletta,* 652 F.2d 218 (1st Cir. 1981).

*Affirmed.*

9. The court, in its final jury instruction, also charged that

> because there was evidence relating to this ... it is important for you to be reminded that the defendant is charged with willfully depriving Mr. Brown of his constitutional right not to

be deprived of liberty without due process of law. He is not charged with failing to rescue Mr. Brown from the water, and therefore any failure on the part of the defendant to attempt to rescue is not in and of itself sufficient to establish the offense.