UNITED STATES of America

v.

Wayne N. COLLAMORE.

Crim. No. 88–00002–P.

United States District Court,
D. Maine.

Nov. 13, 1990.

F. Mark Terison, Asst. U.S. Atty., Portland, Me., for plaintiff.

Claudia Creo Sharon, Portland, Me., for defendant.

## MEMORANDUM OF DECISION AND ORDER DENYING DEFENDANT'S MOTIONS TO DISMISS

GENE CARTER, Chief Judge.

In August 1986 Defendant Wayne Collamore was indicted in Maine Superior Court and was charged with possession of a firearm by a felon, a state offense. Collamore pleaded *nolo contendere* to the charge on March 27, 1987, and was sentenced to a one-year term of imprisonment. One year later, a federal indictment was returned against Collamore, charging him with possession of a firearm by a convicted felon in violation of 18 U.S.C.App. II § 1202(a)(1). The second indictment was based on the same incident giving rise to his state court conviction.

Collamore filed two pretrial motions to dismiss the federal indictment, but he requested that the Court defer ruling on the motions until after trial. Following a jury trial, Collamore was convicted of violating 18 U.S.C.App. II § 1202(a)(1). The Court subsequently held an evidentiary hearing on his motions to dismiss, and the parties stipulated that the transcript of Collamore's trial be part of the record on the motion to dismiss. Now before the Court are Collamore's pretrial motions to dismiss.

Collamore contends that the federal indictment returned against him must be dismissed, arguing that his prosecution in this Court violates rights guaranteed him by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. Specifically, he claims that his federal prosecution violates the double jeopardy provisions of the Fifth Amendment, as well as the speedy trial provisions of the Sixth Amendment and 18 U.S.C. § 3161. He also claims that his prosecution in this Court violates the Due Process Clause of the Fifth Amendment, arguing that: (1) the conduct of the state officials was so outrageous as to constitute entrapment; (2)

his prosecution is the product of intentional and prejudicial preindictment delay; and (3) his prosecution is the result of selective prosecution.

The Court finds no basis to dismiss the federal indictment.

### I. *Facts*

Evaluation of Collamore's claims requires an extensive recitation of the facts leading to his conviction in this Court under the Armed Career Criminal statute. After consideration of the evidence offered at trial and at the post-trial evidentiary hearing, and after a careful assessment of the credibility of the witnesses, the Court finds the following facts established by a preponderance of the evidence.

#### A. The State Plea Bargain

On July 20, 1985, Maine police arrested Collamore, charged him with burglary and theft, and placed him in the Kennebec County Jail. [95, 278][1] Paul Mayberry was arrested with Collamore and was put in the County Jail at the same time. [96]

While Collamore was detained on the burglary and theft charges in late July 1985, his attorney, John Wlodkowski, and the District Attorney for Kennebec County, David Crook, began preliminary plea negotiations. [200–01, 285–87, 333] Wlodkowski relayed a plea proposal from Crook to Collamore in late July 1985, to which Collamore responded by letter on August 1, 1985. G.E. 13; [288]. Collamore's letter stated that he had a "confidential" deal for Crook that "holds only for today." G.E. 13. After Crook received that letter, he and Collamore met alone to discuss the pending criminal charges and the deal proposed by Collamore.[2] [98, 201, 290, 335] At the meeting, Collamore offered to testify against Mayberry, his co-defendant, and to disclose other crimes in which Mayberry had been involved. [290–91] Collamore also expressed his willingness to work as a confidential informant for Crook. *Id.*

---

1. The bracketed citations accompanying the Court's findings of fact refer to page numbers in the trial transcript. The Court's citation system also employs the following abbreviations: "G.E." (Government Exhibit); "D.E." (Defendant's Exhibit); "G.H.E." (Government's Hear-

ing Exhibit); and "D.H.E." (Defendant's Hearing Exhibit).

2. The record does not reveal whether Crook informed Collamore's attorney prior to meeting with Collamore. [200–01, 335–36]

Crook received two more letters from Collamore on August 15 and August 29, 1985. In those letters, Collamore requested another meeting and attempted to persuade Crook to agree to his proposal. G.E. 14; D.E. 13. In the August 29 letter, in addition to indicating that he wished to retain a new attorney, Collamore tried to entice Crook to accept his proposal by promising to furnish information concerning a "very hot" weapon. Collamore stated that he had obtained the information about the weapon from Daniel Nutting, another inmate at the jail whom Collamore had befriended. The letter also stated that the Chief of Police from Hallowell, Maine had questioned Nutting about a missing person from Hallowell. D.E. 13.

At approximately the same time as this flurry of letter-writing and plea proposals, Collamore filed a civil rights action, in response to alleged mistreatment at the jail, against the Sheriff of Kennebec County. D.E. 14; [96–97]. Crook acted as counsel for Kennebec County in that suit. [300] The lawsuit attracted the attention of the local Augusta press and was discussed in at least one newspaper article. [97, 344]

Crook and Collamore had two or three more meetings in early September 1985. [350] Detective James Langella, who was working with the Maine State Police drug unit, was present at one of these meetings, held on September 3, 1985. [331, 392–94] He interviewed Collamore and advised him of the conditions placed on an informant. [395–96] Collamore promised to provide information concerning a child prostitution ring in Portland and narcotics dealing in Lewiston, and again promised to testify against his co-defendant, Paul Mayberry. [297, 299–300, 397–99] Collamore also told Langella that he knew of a .357 Magnum that was buried in Saco. [399] Langella considered Collamore's information to be highly reliable because Collamore mentioned names of persons Langella suspected of being engaged in illegal activity. [400, 406–07]

At one of their early September meetings, Crook and Collamore discussed at length Collamore's civil lawsuit against

Kennebec County, whom Crook represented. [301, 344] Crook told Collamore that the pending suit "undermined their mutual trust" and explained to him the problems faced by the state in housing inmates and the difficulties in the jail system as a whole. [301] Collamore withdrew the suit on September 8, 1985 and simultaneously gave Crook a retraction to be printed in the *Kennebec Journal.* D.E. 5; G.E. 15; [112, 114, 303–05]. Four days later, Crook, Collamore and Wlodkowski signed a plea agreement. D.E. 4. Collamore contends that withdrawal of his civil suit was a condition, required by Crook, of the agreement; Crook denies this assertion. [112, 301–05] The Court finds that Collamore's withdrawal of his civil rights action was a condition imposed by Crook precedent to Crook's entering a plea agreement with Collamore.

The plea agreement required Collamore to plead guilty to the two counts of burglary and theft in Kennebec County and the two similar counts in Lincoln County. In return, Collamore was to be released immediately on his own recognizance. D.E. 4; [122]. If Collamore complied with the agreement, the State agreed to recommend a five-year prison sentence, with all but one year suspended. D.E. 4. Collamore agreed to become a confidential informant, to cooperate with District Attorney Crook and police agents, and to refrain from engaging in any illegal conduct. The State was free to recommend the maximum term on each charge if Crook, after a subjective evaluation of all the facts, determined that the agreement had been breached. *Id.*

At the September 12 meeting, Crook explained orally to Collamore what was expected of a confidential informant: he had to be truthful with the authorities and on time for all meetings, he had to abide by all state laws, he had to be under police supervision whenever he operated in the capacity of an informant, and he was not allowed to reveal his status as an informant to unauthorized persons or to take independent action. [138–39, 295–97, 302]

On the same day that he signed the plea agreement, Collamore pleaded guilty to the

Kennebec County burglary and theft charges in an *in camera* session in Kennebec County Superior Court.[3] [114–15] He was released on his own recognizance the same day. Sentencing was deferred until December, 1985. *Id.* Collamore was scheduled to be arraigned on the Lincoln County charges on September 25, 1985. [121–23, 431–32]

### B. Collamore's Short Tenure as a Confidential Informant

Special Agent Kenneth MacMaster of the Bureau of Intergovernmental Drug Enforcement was present at the September 12, 1985 meeting when Collamore signed the plea agreement. [417–19] At the meeting, Collamore also signed a "conduct of confidential informant" form given him by MacMaster. G.E. 11. The conduct sheet reiterated that Collamore was forbidden, *inter alia,* to sell illegal drugs or other illegal items, to use sexual activity to induce another to sell illegal drugs to the police, to conduct searches of suspects, persons or houses, or to engage in any other type of illegal conduct. *Id.* At the meeting, MacMaster made arrangements to meet with Collamore on September 17. [419]

Collamore met with MacMaster and Sergeant Ronald Moody of the Maine State Police on September 17, 1985 as scheduled. [120, 423, 458] He took them to locations of past burglaries and also told them about various types of criminal activity, including an automobile "chop shop", a child prostitution ring, and drug trafficking in Lewiston. [420–28, 459] The agents explained again to Collamore what conduct would be expected of him as a confidential informant, especially that he always operate under the supervision and observation of the agents whenever he was working as an informant. [425–26, 459–60] The agents were concerned with his status as a convicted felon, and they also wanted any information he gathered to be substantiated

by credible witnesses. [140–41, 423, 426, 458]

During Collamore's September 17, 1985 guided tour of past crime scenes, Collamore told the agents that Daniel Nutting had offered to sell Collamore a .357 Magnum pistol that supposedly was stolen. [428, 460, 463] Collamore told the agents that Nutting had been in the county jail with Collamore and had worked as a hairdresser at Peter & Company in Augusta. Collamore also explained that Nutting had a male lover who had disappeared in a swamp behind a camp in Canaan, Maine. [429, 460]

At his trial in this Court on the charge of possession of a firearm by a convicted felon, the crux of Collamore's defense was his contention that Agents MacMaster and Moody instructed him to retrieve the handgun about which he had spoken. [120, 140] Both MacMaster and Moody flatly contradicted this allegation. [399, 431, 433, 461] The Court finds that neither the agents, nor any other government official, instructed Collamore to retrieve a weapon of any kind.

### C. Arrest for Possession of a Handgun

Between September 12 and September 25, Collamore did not have a permanent place to live, nor did he have relatives with whom he could stay. During that time he stayed with acquaintances, including Paul Mayberry in Sanford. [124, 126, 153] Collamore had been living with Mayberry prior to his arrest for burglary and theft; some of his belongings, including the gym bag found with him when he was arrested, remained at Mayberry's house while he was detained in the county jail in late summer, 1985. [124, 127]

On September 25, 1985, Collamore was scheduled to be arraigned in Lincoln County Superior Court at 9:00 a.m., and then to meet Agents MacMaster and Moody for a second time at 1:00 p.m. [205, 431–32] On

---

**3.** Rule 11 of the Maine Rules of Criminal Procedure requires that a court which accepts a plea of guilty or *nolo contendere* insure that the plea is made knowingly and voluntarily, and that there is a factual basis for the charge. These inquiries must be made in open court. *See*

Maine R.Crim.P. 11(c), (d); *see also State v. Beal,* 446 A.2d 405 (Me.1982). Insofar as revealed by the record, Collamore's September 12, 1985 guilty plea ran afoul of Rule 11's requirement that those proceedings occur in open court.

the morning of September 25, however, Collamore called his attorney, John Wlodkowski, and explained that he was unable to make the arraignment. [125, 206] Collamore told Wlodkowski that he did not have a car and that he had walked from Portland to Saco to meet his girlfriend, arriving at about 7:30 or 8:00 a.m. on September 25. He told Wlodkowski that it had been raining, that he had blisters on his feet from walking all the way to Saco, and he asked Wlodkowski to reschedule the court date. *Id.* Wlodkowski called the Clerk of Court in Lincoln County and rescheduled Collamore's arraignment. D.E. 9; [206]. Wlodkowski also called David Spencer, an Assistant District Attorney for Lincoln County, and left a message to the same effect. [206]

Collamore did not keep his September 25 appointment with agents MacMaster and Moody, nor did he call them to offer an explanation for his absence. Collamore failed to call, despite the fact that he had been given MacMaster's office telephone number and had been told to call that number whenever he had information or needed to talk to the agents. D.E. 8; [157, 430, 432, 446].

At approximately 3:35 a.m. on the morning of September 26, 1985, Officer Dale White of the Portland Police Department observed Collamore standing in the doorway of a used car business in Portland.[4] [19–20] When Collamore saw Officer White's cruiser coming back towards him, he dropped the gym bag to the ground and kicked it under one of the cars on the lot. [128] Officer White found the bag when he investigated the scene, but Collamore denied ever having seen it before. [22–24, 129] White opened the bag and found a screwdriver, a wig, a loaded .22–calibre revolver, a map of the area in Augusta where Peter and Company is located, and documents in the name of Wayne Collamore, including a Superior Court summons and a personal recognizance form from Kennebec County. G.E. nos. 1, 1(A), 2, 3, 4, 6, 7, 8; D.E. nos. 6, 7; [24–28, 117, 164]. Officer

White then placed Collamore under arrest. [29]

Collamore was booked and then taken to the Cumberland County Jail. When the shift changed at 8:00 or 9:00 a.m., Collamore asked a guard whom he recognized to contact Detective Langella. Collamore explained to Langella that MacMaster had authorized him to retrieve the handgun and asked to speak with MacMaster. [130]

When Langella called MacMaster, MacMaster told him that he had not directed Collamore to retrieve the handgun. [448] MacMaster also spoke to Collamore. [131, 451] MacMaster denied Collamore's assertion that he was authorized to possess the .22–calibre handgun, and he told Collamore that the weapon was not even the stolen .357 about which Collamore had previously spoken. MacMaster told Collamore that he would not help him. [131]

On September 27, 1985, the day after Collamore's arrest for possession of the firearm, District Attorney Crook, as a result of Collamore's breach of the plea agreement, moved to accelerate sentencing on the charges of theft and burglary pending against Collamore. D.E. 10. In the motion, Crook stated that Collamore had missed his arraignment in Lincoln County Superior Court, that he had missed a scheduled appointment with agents MacMaster and Moody, and that he had been arrested by Portland Police for possession of a firearm. Crook spoke with MacMaster, but not Collamore or his attorney, before filing the motion. [449]

On November 7, 1985 Collamore was indicted in Cumberland County Superior Court for the state offense of possession of a firearm by a felon. D.H.E. 8.

In December, 1985 Collamore asked a fellow inmate at the jail, Bruce Wellman, to assist him in filing a post-conviction proceeding with respect to his guilty plea on the burglary and theft charges. [765] Wellman wrote to Collamore's attorney and to various court clerks to request back-

---

**4.** The Court rejects for lack of credibility most of Collamore's testimony as to the events on the

night he was arrested.

ground materials necessary to prepare such a proceeding. [766] Shortly thereafter, Crook telephoned Wellman and told him that he wanted Collamore to call him to discuss Collamore's intention to file a post-conviction proceeding.[5] [767, 771, 791]

Sometime in early 1986, Collamore called Crook. [792] Crook advised Collamore that filing his post-conviction review might endanger him due to the possibility that he would be exposed as an informant.[6] A few months later, Collamore wrote a letter to Crook, dated June 4, 1986, in which he threatened to file his post-conviction proceeding and thereby expose the arrangement Crook and Collamore reached with respect to the withdrawal of Collamore's civil rights action. D.H.E. 12. The letter claims that two newspaper reporters were interested in hearing Collamore's story. Collamore proposed that he and Crook reach an agreement with respect to Collamore's post-conviction review and the firearms charges pending against him, before he appeared at Cumberland County Superior Court later that month. Crook wrote a letter in response, dated June 17, 1986, in which Crook suggested to Collamore to "file whatever post-conviction review material you wish to file." D.H.E. 13.

On June 23, 1986, Neale Duffett, an Assistant District Attorney for Cumberland County, mistakenly determined that the state firearms indictment returned against Collamore was technically defective, and thus he dismissed it. D.H.E. nos. 8, 9; [775–80, 786–89]. Collamore was reindict-ed in Cumberland County on August 6, 1986. D.H.E. 7. On March 25, 1987, Collamore pleaded *nolo contendere* in Cumberland County Superior Court, and he received a sentence of one year to the Department of Corrections to be consecutive to sentences he received in Lincoln and Kennebec Counties. [600, 785]

### D. The Federal Case

On September 26, 1985, the day after Portland Police arrested Collamore on the firearms charge, an evidence technician at the Portland Police Department called John Paquette, a Special Agent with the United States Bureau of Alcohol, Tobacco and Firearms (ATF), to enlist his aid in tracing the firearm that had been taken from Collamore. [702] ATF regularly cooperates with local and state police in investigating firearms offenses. [702, 745] Paquette was the first federal agent to have notice of Collamore's case.

The ATF trace established that the revolver was manufactured in Massachusetts by the Harrington and Richardson Company sometime between the years 1956 and 1968. [54–56, 58] The trace showed that Harrington and Richardson shipped the revolver from Massachusetts to a firearms dealer in Maine in 1966. [62] ATF was unable to trace the weapon beyond the Maine dealer, who was no longer in business. [704]

In the Fall of 1985, Richard S. Cohen, the United States Attorney for the District of Maine, met with Maine state district attor-

---

**5.** This Court held a post-trial evidentiary hearing on Collamore's motions to dismiss the indictment on April 9 and 17, 1990. At the hearing, the Court reserved ruling on an oral motion by the government to strike a portion of the testimony of Bruce Wellman. The government contended that Wellman's testimony that Crook called him at the County Jail with respect to Collamore's post-conviction proceeding was hearsay and irrelevant.

The Court now overrules the objection. The statement was not offered for the truth of the matter asserted, but rather to show the state of mind of Crook. Crook's state of mind is relevant to Collamore's claim that Crook attempted to manipulate Collamore's federal prosecution. The Court ultimately concludes that Crook was concerned with Collamore's potential post-conviction review; the record does not, however, sustain the contention that Crook manipulated Collamore's federal prosecution.

**6.** The Court finds that this telephone conversation took place, and that Collamore and Crook discussed Collamore's post-conviction proceeding, but it is unable to discern the entire content of the conversation. The Court makes this finding in part on the basis of Collamore's testimony at the post-trial evidentiary hearing. The fact of the conversation is also corroborated by Crook's June 17, 1986 letter to Collamore, written *in response to Collamore's letter of June 4, 1986*. Crook stated in his June 17 letter: "My only concern in this matter was your own personal safety. . . . It appears to me that you will continue to misinterpret any conversation or letter in a negative way." D.H.E. 13.

neys and advised them of a new federal statute, the Armed Career Criminal statute. [569] That statute was enacted in 1984 and imposes a mandatory minimum fifteen year sentence for a person convicted of receiving or possessing a firearm after having been previously convicted three times of robbery or burglary. *See* 18 U.S.C.App. II § 1202(a). Cohen asked the assembled district attorneys to advise the United States Attorney's office of any cases which might be appropriate for federal prosecution under the statute. [569]

In early December, 1985, Assistant District Attorney Duffett called Mark Terison, an Assistant United States Attorney (AUSA) for the District of Maine, and advised him of Wayne Collamore's arrest for possession of a handgun and his prior criminal convictions. [565, 570, 623] Duffett did not at that time apprise Terison of the state's position with respect to prosecution for the incident. [570] Within a few days of Duffett's call, Duffett sent Terison the arrest report prepared by the Portland Police, a report of a test fire of the handgun, and Collamore's criminal conviction record, which showed nine prior convictions for burglaries and robbery. [570–71, 622, 625]

Terison determined that Collamore's case was appropriate for federal prosecution under the Armed Career Criminal statute. [572, 625] As a general policy, however, the U.S. Attorney's Office does not initiate prosecution on a case before it obtains a report from the appropriate federal investigative agency. [573, 705] On December 9, 1985, Terison forwarded the materials to Agent Paquette at ATF and requested that Paquette prepare an investigative report. G.H.E. 1; [572–73]. Terison was not aware that Paquette had already traced the weapon at the behest of Portland Police. [745]

Agent Paquette telephoned Assistant District Attorney Duffett concerning the Collamore investigation on the next day. [705, 715, 746] Paquette learned from Duffett that the State intended to prosecute Collamore for the state offense of possession of a firearm by a convicted felon. [706, 715] . Paquette told Duffett that ATF would not proceed with a federal investigation of Collamore, in light of the Justice Department's "dual prosecution" policy.[7] [706] Paquette told Duffett to notify him if there was a problem with the state prosecution or the state indictment. [706–07]

The United States Attorney's Office did not act on Collamore's case again until June, 1986, when Duffett called Terison to inform him that he was dismissing the state indictment against Collamore and inquired as to the status of the federal investigation. [576] On June 27, 1986, Terison, in response to Duffett's call, contacted the court clerks in the Superior Courts for Knox and Lincoln Counties and requested that they send him certified copies of Collamore's prior convictions. G.H.E. nos. 2A, 3A; [576–77]. He also contacted Agent Paquette and told him Duffett would be calling as well. [576, 748] Shortly thereafter, Terison received certified copies of Collamore's prior convictions. On July 1, 1986, he forwarded copies to Paquette. G.H.E. 4; [579–80]

Duffett called Paquette on July 2, 1986 to tell him that the state indictment was faulty and had been dismissed. [707] Paquette did not immediately begin an investigation, as he had other ongoing investigations, because he was about to go on vacation, and because he considered Collamore's case to be low priority since Collamore was incarcerated on other state charges and thus posed no immediate danger to the public. [707–08] Neither Duf-

---

7. Pursuant to this internal federal policy, which is also known as the "Petite Policy", the federal government generally will not prosecute anyone who is also the subject of state prosecution, although prosecution by both state and federal authorities for the same conduct is constitutionally permissible. [590.] Exceptions to this policy exist where, for example, the U.S. Attorney learns that the defendant was acquitted in state court or determines that the defendant received an inadequate sentence in state court. [591] If the U.S. Attorney finds that the appropriate circumstances exist, he may apply to the Justice Department for a waiver of the policy. *See Rinaldi v. United States,* 434 U.S. 22, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977); *Petite v. United States,* 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960).

fett nor any other state official informed Paquette or Terison when Collamore was reindicted on August 14, 1986 for possession of the firearm in question.

Paquette began his investigation of Collamore on September 11, 1986, by interviewing District Attorney Crook. Crook explained the circumstances of Collamore's arrest for burglary, the plea agreement, and the termination of the agreement as a result of Collamore's arrest by Portland Police. D.H.E. 2; [725–28]

On October 1, 1986, Paquette estimated that his report on Collamore was 90% complete, that he needed only two statements from local police to complete it, and that the report would be finished by the middle of November, 1986. D.H.E. 5; [753] On October 29, 1986, Paquette interviewed Officer White; he did not work on the Collamore investigation again until January 1987. [730]

From July 1986 to January of 1987 AUSA Terison took no action on the Collamore case. [581] While preparing for a periodic office review of his caseload, Collamore's case again came to Terison's attention. He contacted Paquette by letter dated January 23, 1987 and requested information as to the status of ATF's investigative report. Paquette called Terison a few days later and told him that he would try to complete it and send it to ATF's Regional Office in Boston within a month. G.H.E. 6; [580–83].

In January, 1987, Terison and Paquette believed that no state prosecution was pending against Collamore because Assistant D.A. Duffett had told them the indictment had been dismissed. In early February, 1987, Terison learned from Portland attorney Dan Knight, who was representing Collamore, that a state grand jury had reindicted Collamore on August 6, 1986 on the state firearms charges. [585–86] At approximately the same time, Paquette also discovered that Collamore had been reindicted by the state. [709, 748–49]

The state court prosecution added a new complexity to the federal investigation. In addition to the federal dual prosecution policy ramifications, the state prosecution meant that ATF Agent Paquette could not, under federal investigative policy, submit his case report to the Regional ATF headquarters without getting the special approval of the local United States Attorney. [594, 710] Paquette, after learning of the state prosecution, asked Terison to obtain authority from the United States Attorney so that he could submit his report to ATF's regional office in Boston. [594]

Terison sent a memorandum, dated February 9, 1987, to United States Attorney Cohen, as well as to First Assistant United States Attorney, Jack Gleason. G.H.E. 8; [595]. The memorandum explained the status of the Collamore investigation and also requested permission for Paquette to submit his case report to ATF Regional Headquarters in Boston. Gleason recommended to Cohen that the federal government decline to prosecute Collamore in light of the state prosecution. Cohen authorized Paquette to submit his report, and Terison relayed the message to Paquette. [597]

Two months later, on April 9, 1987, AUSA Terison received the ATF case report concerning Collamore from the ATF office in Boston. G.H.E. 9; [597]. At that time Terison was involved in a complex embezzlement action. [598] After completing that case and a few other matters he considered more important, in early June, 1987, Terison called the Clerk's office of the Cumberland County Superior Court to inquire into the status of Collamore's state prosecution. The Clerk informed him of Collamore's *nolo* plea and his sentence of one year, to be served consecutively to the other sentences he received in Lincoln and Knox Counties. [591–601] Terison prepared a memorandum which he sent to U.S. Attorney Cohen and First Assistant Gleason, apprising them of Collamore's fate in state court and recommending, in light of the Petite Policy, that the federal government decline prosecution. G.H.E. 10; [601]. Gleason approved declination on June 26, 1987; ATF Agent Paquette was adamantly opposed. [602–04]

U.S. Attorney Cohen reviewed Terison's memorandum and conversed with Terison. Cohen felt that the gravity of the crime,

the light state sentence Collamore had received, and the fact that Collamore was the type of defendant Congress intended to ensnare with the Armed Career Criminal statute, weighed in favor of federal prosecution. [604] Terison informed Cohen of Paquette's stance that Collamore should be federally prosecuted, and Cohen told Terison that he wanted to meet Paquette to hear his views. [605]

The federal investigation of Collamore received low priority in the U.S. Attorney's Office, and no action was taken between June 1987 and September 1987. [605–06] When Cohen returned from his summer vacation on September 9, 1987, he told Terison that he wanted to talk to Paquette about Collamore's case. [606] At a September 24, 1987 meeting between Cohen and Paquette, Cohen expressed his concern with Collamore's defense that he was acting as an informant and agent of the Maine State Police. Paquette assured Cohen that, after hearing MacMaster and Crook's versions of the events, he believed that there was no merit to Collamore's defense. D.H.E. 4; [734, 739, 755].

Following the meeting between Cohen and Paquette, Cohen directed Terison to prepare the necessary documents to receive a waiver of the Petite Policy from the Justice Department in Washington. [607, 711] Terison submitted the necessary documents to Cohen, who forwarded them to the Justice Department on September 28, 1987. G.H.E. 13; [608–09] The Justice Department approved a waiver of the Petite Policy in Collamore's case by "letter of authorization to prosecute," dated November 20, 1987. G.H.E. 14.

Having obtained a waiver of the dual prosecution policy, Terison prepared the Collamore case for presentation to a federal grand jury. The District of Maine does not have a continuously sitting grand jury; a grand jury meets monthly for two days. A grand jury was scheduled to hear the Collamore case in December 15, 1987, but that sitting was cancelled. Collamore's case was rescheduled and went before a federal grand jury on January 21, 1988, which returned an indictment against Colla-more on the same day. G.H.E. 15; [611–14].

Collamore filed *pro se* motions for a bill of particulars on January 31, 1988, and for a speedy trial on February 23, 1988. The government's application for a writ of *habeas corpus ad prosequendum* was granted on March 3, 1988, and Collamore appeared before the Court for arraignment on April 8, 1988.

On April 18, 1988, ten days after his arraignment, Collamore moved to extend the time for filing pretrial motions. The Court granted the motion and extended the filing deadline to May 6, 1988. Collamore again moved to extend the filing deadlines on May 6. The Court granted the motion extending the deadline to May 16, 1988, ordering that no further extensions be granted. On May 16, 1988, Collamore filed motions for discovery and to suppress evidence, as well as a motion to dismiss the indictment. On May 17, 1988, he requested hearings on the motions to suppress and to dismiss. Collamore also moved on May 16, 1988 to bifurcate the possession element of the crime from the element pertaining to the prior convictions. *See* 18 U.S.C.App. II § 1202(a)(1).

On June 1, 1988, the Court denied Collamore's motion to bifurcate trial, and also ruled that no action was necessary on Collamore's motion for discovery. Hearings on Collamore's motions to dismiss and to suppress evidence were scheduled for June 6, 1988, the same day that a jury was to be chosen in Collamore's trial. On June 6, 1988, at Collamore's request, the Court reevaluated its ruling on the bifurcation issue and ordered that Collamore's trial be bifurcated. (See Transcript of Proceedings, Vol. II No. 12, at 10–11.) Also on June 6, the Court held a hearing on Collamore's motion to suppress evidence, and stated that it would hold a hearing on Collamore's motion to dismiss on June 7. (See *id.* at 3, 15–16; Transcript of Proceedings, Vol. III No. 13.) On the morning of June 7, 1988, the government informed the Court of its intention to file a notice of appeal of the Court's bifurcation order. (See Transcript, Vol. II No. 12, at 16.) On that date the

Court denied Collamore's motion to suppress in open court. (*Id.* at 20.) At Collamore's request, the government filed its notice of appeal before hearing was held on the motion to dismiss. (*Id.* at 19.) Proceedings in this Court were stayed pending resolution of the appeal.

In August, 1988, Collamore filed a motion claiming that the Court of Appeals lacked jurisdiction over the government's appeal; the government contended that the Court of Appeals had jurisdiction over the appeal as an order excluding evidence. The Court of Appeals granted the government's request for an extension of time to file its brief on appeal, extending the deadline to September 7, 1988. Unsure of appellate jurisdiction, the government filed a petition for a writ of mandamus in September 1988, together with its brief on appeal. The Court of Appeals granted the writ of mandamus on February 17, 1989; it did not rule on the jurisdictional issue. *United States v. Collamore,* 868 F.2d 24, 27 (1st Cir.1989). Collamore's trial was scheduled to commence on March 21, 1989, but that trial date was cancelled because Collamore had filed a petition for rehearing before the Court of Appeals on March 7, 1989 and thus the Court of Appeals' mandate had not yet issued. The Court of Appeals denied Collamore's petition for rehearing on March 21, 1989 and its mandate issued on March 30, 1989.

Once the mandate issued, the Court, on May 9, 1989, scheduled a hearing on Collamore's motion to dismiss for July 5, 1989 and jury selection for July 6, 1989. Collamore filed a second motion to dismiss the indictment on June 27, 1989. At Collamore's request, hearing on the motions to dismiss was continued until after trial.

At Collamore's jury trial in this Court, held on July 12, 13, 14, and 17, 1989, the parties stipulated that prior to September 26, 1985, Collamore had been convicted in the State of Maine of a crime punishable by a term exceeding one year. Following trial, at which Collamore testified on his own behalf, the Court instructed the jury as to the elements of the offense, and also on the defenses of entrapment and entrapment by estoppel. The jury found Collamore guilty of a single offense of violating 18 U.S.C. App. § 1202(a)(1).

## II. *Legal Conclusions*

### A. Double Jeopardy

■ Collamore claims that his prosecution in this Court violates the double jeopardy provisions of the Fifth Amendment to the United States Constitution. It is well settled that a defendant prosecuted by state authorities may also be convicted of a federal offense arising out of the same conduct. *Heath v. Alabama,* 474 U.S. 82, 88, 106 S.Ct. 433, 437, 88 L.Ed.2d 387 (1985); *United States v. Lopez Andino,* 831 F.2d 1164, 1167 (1st Cir.1987). Collamore concedes that successive prosecutions by different sovereigns do not violate the double jeopardy clause, but he contends that the federal prosecution is a product of vindictiveness on the part of the state prosecutor, David Crook. He argues that in these circumstances successive prosecutions are prohibited.

The exception sought to be invoked by Collamore stems from a passage in *Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959). There the Supreme Court, in rejecting a defendant's attack on a state prosecution following a federal prosecution, stated:

> The record establishes that the prosecution was undertaken by state prosecuting officials within their discretionary responsibility and on the basis of evidence that conduct contrary to the penal code of Illinois had occurred within their jurisdiction. It establishes also that federal officials acted in cooperation with state authorities, as is the conventional practice between the two sets of prosecutors throughout the country. It does not support the claim that the [state] in bringing its prosecution was merely the tool of the federal authorities, who thereby avoided the prohibition of the Fifth Amendment against a retrial of a federal prosecution after an acquittal. It does not sustain a conclusion that the state prosecution was a sham and a cover for a federal prosecution, and thereby in essential fact another federal prosecution.

*Id.* at 123–24, 79 S.Ct. at 678 (footnotes omitted).

 Numerous courts have construed *Bartkus* as creating an exception to the dual sovereignty doctrine.[8] To come within the exception, Collamore must show that the federal authorities were merely a tool for the state prosecutors, or that the federal prosecution was a sham and a cover for double prosecution by state officials. *See e.g. United States v. Jordan,* 870 F.2d at 1313. Mere cooperation between state and federal officials does not trigger the *Bartkus* exception. *Id.*

Collamore's claim of vindictiveness and personal interest on the part of District Attorney Crook is summarized as follows. Collamore contends that Crook directed Assistant D.A. Duffett of the Cumberland County D.A.'s office to dismiss the first state indictment returned against Collamore. Collamore claims that Crook was motivated to do so by Collamore's June 4, 1986 letter to Crook, in which Collamore threatens to expose the agreement Crook and Collamore reached with respect to the withdrawal of Collamore's civil rights suit. Collamore further contends that Crook instructed Duffett to call the federal authorities to jump-start Collamore's federal prosecution. Furthermore, Collamore asks the Court to infer that Crook convinced Paquette to oppose declination of Collamore's federal prosecution. In turn, Collamore claims, Paquette convinced U.S. Attorney Cohen to seek a waiver of the Justice Department's dual prosecution policy.

 Collamore's imagined conspiracy rests on the premise that Crook duped the federal prosecutors into conducting what was, in effect, another state prosecution. To accept this theory, the Court would have to find that Crook tainted the federal prosecution to such a degree that it was, in reality, a sham or a mere tool for a second state prosecution.

The record simply does not support Collamore's theory. Collamore invites the Court to engage in unrestrained speculation concerning improper motive and manipulation on the part of Crook, Duffett, Paquette, and presumably others as well. Collamore's scenario would require the Court to make at least three large inferential leaps: first, that Crook, District Attorney for Kennebec County, conspired with Duffett, an Assistant District Attorney for Cumberland County, to manipulate Collamore's Cumberland County prosecution in the hope of influencing a possible federal prosecution; second, that Duffett manipulated Collamore's federal prosecution through his contacts with federal agents and prosecutors; and third, that Crook conspired with Agent Paquette to influence U.S. Attorney Cohen's decision to seek waiver of the Petite Policy. The Court is not permitted to "pile inference upon inference" in such a manner. *See United States v. Antonino,* 830 F.2d 798, 806 (7th Cir.1987).

Moreover, Collamore's theory clashes with credible testimony to the contrary. First, Duffett testified, credibly in the evaluation of the Court, that the decision to dismiss Collamore's first state indictment was his alone, based on his mistaken belief that it was defective. He knew Collamore was incarcerated on other state charges and that he could simply file another indictment. There is absolutely no credible evidence suggesting that Duffett conspired with Crook to manipulate Collamore's federal prosecution.

Furthermore, there is no hint in the record that the federal prosecutors knowingly conspired with Crook or other state prosecutors to deprive Collamore of his constitutional rights.[9]

8. *See e.g. United States v. Jordan,* 870 F.2d 1310, 1313 (7th Cir.1989); *United States v. Liddy,* 542 F.2d 76, 79 (D.C.Cir.1976); *United States v. Bernhardt,* 831 F.2d 181, 182 (9th Cir.1987); *United States v. Moore,* 822 F.2d 35, 38 (8th Cir.1987); *United States v. Aboumoussallem,* 726 F.2d 906, 910 (2d Cir.1984).

9. It is undisputed that AUSA Terison opposed federal prosecution of Collamore, as did First Assistant U.S. Attorney Gleason. Collamore's argument rests on the premise that Agent Paquette dissuaded U.S. Attorney Cohen from declining federal prosecution. The record does not support an inference that U.S. Attorney Cohen knowingly applied for a waiver of the dual prosecution policy so that the U.S. Attorney's

**1024**

Finally, U.S. Attorney Cohen had reservations about declination in Collamore's case, even before his meeting with Agent Paquette. Cohen determined that the Petite Policy should be waived in Collamore's case, and the Justice Department concurred. The Court finds that waiver of the Petite Policy in Collamore's case was supported by legitimate, good faith reasons.

It is true that Cohen had concerns with respect to Collamore's defense that he was acting in an informant capacity in possessing the handgun. Paquette eased Cohen's fears, primarily because he had interviewed Agents MacMaster and Moody and had determined that, in his judgment, the facts as claimed by Collamore simply were not true. After Collamore's federal trial, this Court, as well as the jury, came to the same conclusion.

In short, the Court finds that Collamore's federal prosecution proceeded independently of State influence, apart from limited and permissible cooperation. Collamore, therefore, has failed to demonstrate that he meets the *Bartkus* exception to the dual sovereignty doctrine.[10]

**B. Outrageous Government Conduct**

Collamore claims that the conduct of the state officials was so outrageous that it violated his right to due process of law. A defendant may succeed on such a claim "if the government's conduct has reached a 'demonstrable level of outrageousness.'" *See United States v. Bradley,* 820 F.2d 3, 7

(1st Cir.1987) (quoting *United States v. Porter,* 764 F.2d 1, 8 (1st Cir.1985)). Typically, such a claim involves alleged overinvolvement on the part of the government in manufacturing the crime. *Bradley,* 820 F.2d at 7. Whether the government's conduct reached an unconstitutionally impermissible threshold presents a question of law for the Court. *Id.* at 7 n. 5.

Collamore's due process claim, to a great extent, mirrors the entrapment defenses which were presented to, and rejected by, the jury. Entrapment and due process defenses are, however, distinct types of claims. *Bradley,* 820 F.2d at 7 n. 5.

The Court concludes that Collamore's right to due process was not violated by any outrageous government conduct. The record facts simply do not support his claim of outrageous conduct on the part of either the state or federal officials.

First, the Court has found that Agents MacMaster and Moody never instructed Collamore to retrieve the .357 handgun which he had mentioned to them.[11] This finding completely undermines Collamore's claim that those agents were responsible for his possession of the .22–calibre handgun found in his possession when he was arrested by Portland Police. Furthermore, Collamore has failed to persuade the Court that the .22–calibre pistol was the same handgun he had mentioned to Crook and the police. Even if it were the same weapon he had spoken of previously, and it had

Office could act in conspiracy with District Attorney Crook to deprive Collamore of his right to be free from double jeopardy.

**10.** In his memorandum of law in support of his motions to dismiss, Collamore argues that the alleged "manipulations of the state and federal prosecutions by state and federal officials" violated his Fifth Amendment right to due process, in addition to nullifying the dual sovereignty doctrine. Because the Court finds that the factual predicates for Defendant's assertions are lacking, it concludes that his due process claim based on vindictive prosecution also fails. *See United States v. Bassford,* 812 F.2d 16, 21 (1st Cir.1987.)

**11.** The Court has concluded, after a careful assessment of the witnesses' credibility, that Agents MacMaster and Moody never instructed

Collamore to retrieve the handgun, nor did their conduct leave Collamore with a reasonable belief that he was justified in possessing it. Moreover, Collamore's explanation that he was going to deliver the handgun to the agents is internally inconsistent. Collamore was aware that he was not to take any independent action; yet he never told the agents that he was planning to retrieve and possess the gun. [141] Furthermore, he was apprehended with the firearm on the morning of September 26, *after* he had already missed his scheduled meeting with the agents. His explanation that he was traveling to Augusta to meet with the agents on September 26 does not make sense, since he had already missed the meeting in Augusta, and he had not called the agents. Collamore had MacMaster's telephone number, as well as access to a telephone (since he had been able to call his attorney to postpone his arraignment).

originally derived from inmate Nutting, MacMaster and Moody never authorized him to retrieve or possess it, and in fact reiterated to him on several occasions that he was not to engage in illegal activity. No government actor authorized Collamore to possess the handgun, nor did he reasonably believe that he possessed such authorization.

■ Collamore also claims that the federal indictment must be dismissed, arguing that the conduct of Crook and MacMaster following Collamore's arrest for possession of the handgun violated his right to due process. The Court finds no merit in this contention. Crook was entitled to terminate the agreement after Collamore had breached it by possessing a firearm and by missing a scheduled appointment with police agents. Further, Crook's motion to accelerate sentencing following termination of the agreement was a reasonable exercise of prosecutorial discretion.[12] Finally, Agents MacMaster and Moody were under no duty to aid Collamore after he had been arrested for possession of the firearm, since they never authorized him to possess it in the first place.

12. The Court is satisfied, however, that the conduct of District Attorney Crook in handling Collamore's case was not a model of propriety. The Court is particularly troubled by D.A. Crook's involvement with the withdrawal of Collamore's civil rights lawsuit. However, Collamore has not established a link between any impropriety on the part of Crook and Collamore's federal prosecution. Thus, Crook's conduct does not affect the validity of the federal indictment returned against Collamore.

13. Collamore's Sixth Amendment right to a speedy federal trial did not attach until a "federal accusation" had been made against him. *See United States v. MacDonald,* 456 U.S. 1, 7, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1982); *United States v. Lovasco,* 431 U.S. 783, 788–89, 97 S.Ct. 2044, 2047–48, 52 L.Ed.2d 752 (1977); *United States v. Marion,* 404 U.S. 307, 313 (1971); *United States v. Marler,* 756 F.2d 206, 210 (1st Cir. 1985). Collamore was not "federally accused" until the federal indictment was returned against him; his prior state arrest and indictment did not trigger his Sixth Amendment right to a speedy trial. *Marler,* 756 F.2d at 211.

The *Marler* Court left open the question whether a limited exception to this doctrine may exist where the basis for a state arrest is a

## C. Prosecutorial Preindictment Delay

■ Collamore claims that the government was responsible for an excessive preindictment delay that violated his Fifth Amendment right to due process of the law.[13] To prevail on this claim, Collamore "bears the heavy burden of showing that the delay in indictment caused him *actual* prejudice *and* that delay 'was undertaken by the Government solely to gain tactical advantage over the accused.'" *United States v. Marler,* 756 F.2d at 213 (emphasis in original) (quoting *United States v. Lovasco,* 431 U.S. 783, 795, 97 S.Ct. 2044, 2051, 52 L.Ed.2d 752 (1977)); *see also United States v. Gouveia,* 467 U.S. 180, 192, 104 S.Ct. 2292, 2299, 81 L.Ed.2d 146 (1984).

■ Collamore has failed to establish that the government's preindictment delay resulted from an attempt to gain unfair tactical advantage or from some other bad faith motive.[14] Nothing in the record suggests that the federal prosecutors attempted to secure a tactical advantage over Collamore. On the contrary, most of the delay is explained by the Justice Department's dual prosecution policy and the less than diligent attention devoted to Collamore's

federal law violation. *Id.* at 211–12 (citing *United States v. Cabral,* 475 F.2d 715 (1st Cir.1973)). The Court holds that there is no such exception. *See United States v. MacDonald,* 456 U.S. at 10 n. 11, 102 S.Ct. at 1503 n. 11 ("Of Course, an arrest or indictment by one sovereign would not cause the speedy trial guarantees to become engaged as to possible subsequent indictments by another sovereign.") Excessive preindictment delay may, however, implicate Defendant's general due process rights. *Id.* at 7, 102 S.Ct. at 1501; *Marler,* 756 F.2d at 211.

14. In support of his claim that the delay caused actual prejudice, Collamore argues that Mayberry was originally willing to testify but that at Collamore's federal trial, Mayberry claimed his Fifth Amendment right not to testify. Collamore also claims that the memory of another witness, Lee Newton, was deleteriously affected by the passage of time. The asserted prejudice seems "highly speculative," since "it is far from certain that [Mayberry] would have waived his fifth amendment right to testify" had trial been conducted earlier. *See United States v. Capone,* 683 F.2d 582, 589 (1st Cir.1982). The Court does not address these issues, however, because it finds that Collamore has failed to establish the second element of his due process claim.

case, as it continued to unfold, by Agent Paquette and AUSA Terison. The Court of Appeals for the First Circuit has explicitly held that compliance with the Petite Policy is not the type of abusive, bad faith motive which may implicate a defendant's right to due process. *Marler*, 756 F.2d at 215. Those portions of the delay attributable to Paquette's slipshod and plodding attention to his workload and other demands on Terison's time do not equate to positive intent to obtain a tactical advantage over Collamore. The contributions of Paquette and Terison in failing to push on with Collamore's prosecution may, at worst, constitute negligence; they were not, however, impelled by any bad-faith motive against Collamore.

The dual prosecution policy does not fully account for the period between Collamore's state arrest and his federal indictment.[15] However, after examining the circumstances contributing to the delay, the Court finds no bad-faith motive behind the delay, nor does the delay violate "those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' and which define 'the community's sense of fair play and decency.'" *United States v. Lovasco*, 431 U.S. at 790, 97 S.Ct. at 2048 (citations omitted).

The Court discerns two phases to the preindictment delay once the federal investigation began. ATF is responsible for any delay prior to the U.S. Attorney's Office receipt of the ATF investigative report on April 9, 1987, since the policy of that office dictated that it not initiate prosecution before it received the ATF report. Following receipt of the report, any delay is attributable to the U.S. Attorney's Office.

Agent Paquette handled ATF's investigation of Collamore. Paquette ascribed a low priority to Collamore's case because he knew Collamore was already incarcerated on state charges and thus posed no immediate danger to society. Paquette, therefore, first completed other cases and took his scheduled vacation, and his investigation of Collamore did not really commence until September 1986. Paquette did not complete his report until February 9, 1987, when he submitted it to ATF's Boston office. The Boston office forwarded the report to the U.S. Attorney's Office for the District of Maine on April 9, 1987. The delay from July 1986 to June 1987 was caused primarily by the low priority ATF assigned to Collamore's case, not by any bad-faith motive against Collamore.

The second phase of the delay—from April 9, 1987, when the U.S. Attorney's Office received the ATF report, to January 21, 1988, when Collamore was indicted—is attributable to the U.S. Attorney's Office. Due to a pressing caseload, AUSA Terison could not return to the Collamore case until June 1987. At that time he sent a memorandum to the U.S. Attorney, Richard S. Cohen, recommending that prosecution of the Collamore case be declined. Cohen, who was told of Paquette's adamant opposition to declination, wanted to speak with Paquette before making a final decision. Cohen did not request a meeting with Paquette until September 9, 1987, and did not actually speak with him until September 24, 1987. The three-month delay from June until September 1987 was in fact caused, whether or not it should have been permitted to occur, by summer vacation schedules at the U.S. Attorney's Office and not by any subjective motivation against Collamore.

The period between Cohen's decision to apply to the Justice Department for a waiver of the Petite Policy on September 24, 1988, and the Justice Department's approval of the waiver by letter dated November 20, 1987, is attributable to the dual prosecution policy. After waiver was approved, Collamore was brought before the next sitting grand jury, on January 21, 1988. The delay between the final decision to prose-

---

**15.** AUSA Terison first learned of Collamore's case in December 1985, and promptly submitted the case to Agent Paquette at ATF for investigation. Paquette learned that a state prosecution was pending, and, in accordance with the dual prosecution policy, put the case into inactive status. Both Terison and Paquette, however, learned of the dismissal of the first state indictment in late June or early July, 1986, and then the federal investigation of Collamore proceeded. Up to that point, the delay was fully justified by the dual prosecution policy.

cute Collamore federally and his indictment was caused by legitimate time constraints implicit in the court system.

A substantial portion of the preindictment delay is justified by the Justice Department's dual prosecution policy. The remainder is explained by a busy ATF office, a crowded caseload at the U.S. Attorney's Office, and the low priority assigned to Collamore's case for the legitimate reason that Collamore was incarcerated on other state charges and posed no immediate danger to society. Although the Court does not condone these delays, it finds no abusive or bad faith motive behind them, and thus Collamore's due process claim fails.[16]

### D. Speedy Trial Act

Collamore argues that the government violated his federal statutory right to a speedy trial. The Speedy Trial Act states in pertinent part:

In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.

18 U.S.C. § 3161(c)(1). The same section provides that certain "periods of delay shall be excluded ... in computing the time within which the trial ... must commence." *Id.*, § 3161(h). One excludable period is for "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." *Id.*, § 3161(h)(1)(F). Another excludable period is for delay resulting from interlocutory appeals. *Id.*, § 3161(h)(1)(E).

Collamore was indicted by a federal grand jury on January 21, 1988, was arraigned on April 8, 1988, and was tried on July 12 through 17, 1989. The Speedy Trial Act's seventy day period began on April 9, 1988, the day after his arraignment.[17] Approximately fifteen months elapsed between his arraignment and the commencement of his trial. The Court finds, however, that all but ten days of this period are excludable, for purposes of the Speedy Trial Act, due to the filing of pretrial motions and the government's interlocutory appeal. *See Henderson v. United States*, 476 U.S. 321, 330, 106 S.Ct. 1871, 1876, 90 L.Ed.2d 299 (1986); *United States v. Vachon*, 869 F.2d 653, 656 (1st Cir.1989).

Collamore's April 18th and May 6th motions to extend the time for filing motions stopped the speedy trial clock until May 16, 1988. Collamore's May 16th motion to dismiss the indictment prevented the speedy trial clock from restarting. The period between May 16 and June 7, 1988, when the Court had under advisement Collamore's motions for bifurcation, to suppress evidence and for discovery, is excludable under the Speedy Trial Act. *See* 18 U.S.C. § 3161(h)(1)(F).

The government's June 7, 1988 notice of appeal of the Court's bifurcation ruling started a new period of excludable

---

**16.** In an appropriate case, a defendant might be able to show a due process violation based on excessive preindictment delay "incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense." See *United States v. Lovasco*, 431 U.S. at 795 n. 17, 97 S.Ct. at 2051 n. 17. Without deciding whether such a showing would be sufficient to make out a due process claim, the Court finds that Collamore has failed to demonstrate that the federal prosecutors acted in reckless disregard of Collamore's interest in mounting an effective defense, nor has he made a particularly strong showing of actual prejudice.

**17.** Collamore contends that the period between his federal indictment and arraignment should be counted toward the speedy trial period because he was in custody on state charges and no detainer was filed. He argues that the government failed to promptly obtain his presence for trial and thus violated 18 U.S.C. § 3161(j)(1). Even if the government did not comply with that section, dismissal of the indictment is not warranted because Collamore has not shown sufficient prejudice or an improper prosecutorial motive for the delay. *See United States v. Anderton*, 752 F.2d 1005, 1008 (5th Cir.1985.)

time under the Speedy Trial Act. *See Id.*, § 3161(h)(1)(E). The period from June 7, 1988 to March 30, 1989, when the mandate of the Court of Appeals issued, is excluded for speedy trial purposes.[18] *See id.* Moreover, at Collamore's request, the hearing on his motion to dismiss was continued until after the appeal was decided, and proceedings in this Court were stayed during the period of the appeal. Thus Collamore's motion to dismiss continued to result in excludable time under 18 U.S.C. § 3161(h)(1)(F).

■■■ After the mandate of the Court of Appeals issued, the Court scheduled a hearing on Collamore's motions to dismiss as soon as was practicable.[19] At Collamore's request, the hearing scheduled for July 5, 1989 was postponed until after trial. Thus the entire period from May 16, 1988 to July 12, 1989, when trial commenced, is excluded for speedy trial purpose, and no statutory speedy trial violation occurred.

### E. Sixth Amendment Right to Speedy Trial

The Sixth Amendment to the United States Constitution guarantees a defendant a speedy trial. *See Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). A defendant's right to a speedy trial must be evaluated on "an ad hoc" basis; the Court must engage in a "difficult and sensitive balancing process ... with full recognition that the accused's interest in a speedy trial is specifically af-

firmed in the Constitution." *Id.* at 533, 92 S.Ct. at 2193. This balancing test requires the Court to evaluate four factors: the length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. *Id.* at 530, 92 S.Ct. at 2192. These factors are related and must be considered together with any other relevant circumstances.

■■■ The length of the delay is a triggering mechanism: unless there is some presumptively prejudicial delay, there is no need to examine the other factors. *United States v. Marion*, 404 U.S. 307, 313–320, 92 S.Ct. 455, 459–63, 30 L.Ed.2d 468 (1971). The length of the delay is measured from the date of a defendant's federal accusation; accusation is effected either by arrest, service of summons, or by indictment. *Id.*

■■■ Collamore stood federally accused after a federal indictment was returned against him on January 21, 1988. *See infra* note 13. His federal trial commenced on July 12, 1989. This period of approximately one and a half years is sufficient to warrant examination of the remaining factors.

■■■ After examining all the relevant circumstances, the Court concludes that Collamore's Sixth Amendment right to a speedy trial was preserved. The dominant reason for the delay between indictment and trial was the government's interlocutory appeal. The government ultimately

---

18. The Court finds that the appeal was not frivolous, nor was it motivated by bad faith; indeed, the government ultimately prevailed on its petition for mandamus. *Cf. United States v. Ferris*, 751 F.2d 436, 441 (1st Cir.1984.)

19. Collamore contends that the exclusion of time under the pretrial motion provision, 18 U.S.C. § 3161(h)(1)(F), is limited to "only such delay as is reasonably necessary from the time of filing [the] pretrial motion to the time of concluding a hearing on it or completing a hearing on it or completing submission of matter to the court for decision." *United States v. Mitchell*, 723 F.2d 1040, 1047 (1st Cir.1983). However, the Supreme Court disapproved the rule announced in *Mitchell*, holding that "Congress intended subsection (F) to exclude from the Speedy Trial Act's 70–day limitation *all time between the filing of a motion and conclusion of*

*the hearing on that motion, whether or not a delay in holding that hearing is 'reasonably necessary.'"* *Henderson v. United States*, 476 U.S. at 330, 106 S.Ct. at 1877 (emphasis added). *See also United States v. Vachon*, 869 F.2d 653, 656 (1st Cir.1989).

Collamore argues that, under *Henderson*, circuit or district court rules limit the excludability of time under subsection (F). *See id.* 476 U.S. at 328, 106 S.Ct. at 1876. Even if there is such a limitation, the Court has met its requirements. The District of Maine's "plan for prompt disposition of criminal cases" provides that "All pretrial hearings shall be conducted as soon after the arraignment as possible, consistent with the priorities of other matters on the court's criminal docket." *The Court scheduled hearing on Collamore's motion to dismiss in compliance with this guideline.*

succeeded in obtaining a writ of mandamus, which is "prima facie evidence of the reasonableness of the Government's action." *United States v. Loud Hawk*, 474 U.S. 302, 316, 106 S.Ct. 648, 656, 88 L.Ed.2d 640 (1986). Other periods of delay resulted from Defendant's own requests for enlargements of time and for rehearing before the Court of Appeals, and from time periods reasonably required for the Court to act on the series of pretrial motions. These are valid justifications for the delay and are not weighed against the government. The Court has balanced the remaining factors and finds no violation of Collamore's Sixth Amendment right to a speedy trial.

### III.

In sum, the record does not support Defendant's claims that the federal indictment returned against him must be dismissed. Accordingly, it is ORDERED that Defendant's Motions to Dismiss be, and they are hereby, DENIED; the Clerk shall schedule this matter for sentencing as soon as the Court calendar will permit.